**UNIVERSAL SHELTERS OF AMERICA, INC., Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

No. 00–726C.

United States Court of Federal Claims.

May 12, 2009.

Edward J. Friedman, Friedman & Friedman, P.A., Baltimore, Maryland, for the plaintiff. Rosemary E. Allulis, Weinstock, Friedman & Friedman, P.A., Baltimore, Maryland, of counsel.

Kelly B. Blank, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Deborah A. Bynum, Assistant Director, all of Washington, D.C., for the defendant. Kim Churchill, Department of the Navy, Bremerton, Washington, of counsel.

### OPINION AND ORDER

WOLSKI, Judge.

This case, brought under the Contract Disputes Act, 41 U.S.C. §§ 601–13 ("CDA"), concerns the United States Navy's decision to terminate, for cause, a contract for commercial items. Under this contract, plaintiff Universal Shelters of America ("Universal") was to provide the Navy with four temporary, reusable structures to be placed on the decks of decommissioned ships to shelter dismantlement operations and contain the resulting debris. Universal was to design the structures to meet contract specifications, including the ability to withstand winds of a certain speed, and to supply the parts and a technical representative to guide the Navy's assembly and installation of the structures. Each containment unit was to be made up of three separate sections which could, by rolling on rails, retract into the largest section or telescope to full-length. When the first containment was being assembled and installed, overnight winds caused one section, already sitting on the deck of a ship, to tilt to one side, and damaged another section that was on a nearby pier. The Navy, dissatisfied with Universal's response to a cure notice, terminated the contract for cause, concluding that the design of the containment structures failed to meet the contract specifications. Universal challenges this decision, and the government seeks reprocurement and incidental costs. A trial on these two matters was held, and, as is described in detail below, the Court finds that the termination was

proper, but that jurisdiction is lacking to award damages to the government at this time.

# I. BACKGROUND

## A. The Contract

On January 13, 2000, the Navy's Fleet and Industrial Supply Center issued a priority rated request for quotations, requiring offers to be received in eight days for items to be delivered within seven weeks. Joint Exhibit ("JX") 1 at 1–2, 5. A contract was awarded to Universal on January 24, 2000, for the purchase of four "rolling telescoping containments" and the assistance of an on-site technical representative to aid Navy personnel in the assembly and installation of the structures. JX 2 at 1, 3–4, 12. The containments were for the use of the Puget Sound Naval Shipyard ("PSNS"), located in Bremerton, Washington. *Id.* at 4, 6, 12. Under the contract, the delivery date for the unassembled containments was February 29, 2000, and the technical representative's services were to be completed on or by March 10, 2000. *Id.* at 3–4, 6. Universal was to be paid $89,134 for each set of two containments, and $11,200 for the installation assistance, for a total of $189,468. *Id.*

Two containments were purchased to be initially used on the deck of the former USS Texas and two for initial use on the former USS Virginia, two decommissioned nuclear cruisers which were being dismantled at PSNS. *See id.* at 4; *see also* Trial Tr. ("Tr.") at 103–05. In the contract specifications, the items purchased for each ship were described as "(2) crane liftable rolling telescoping containments." JX 2 at 12 (¶ 1.1.1). The specifications required:

> Each containment shall provide a covered clear space envelope of 53–feet maximum width by a maximum length of 54–feet and a minimum inside height of 17 feet at the center (See Enclosure 1). The containment in part shall roll completely clear of its length and retract to a collapsed depth of not more than 20 feet to allow the opening it covers to be completely accessible to overhead crane operations.

*Id.* The referenced Enclosure 1 showed that each containment was to consist of three sections. *See id.* at 21. Other enclosures showed that the minimum inside width of the smallest of the three sections was 45 feet. See *id.* at 22–23 (Enclosures 2 and 3). The middle section was of unspecified width, but was necessarily between the 53–feet maximum of the largest section, and the 45–feet minimum of the smallest section. *See id.* at 22. Each containment was to cover a workspace that was "an opening in the cruiser main deck of 50 feet in length and a width of 44 feet," JX 2 at 13 (¶ 3.1.1), and was to "eventually be utilized for several different ships in dry dock." *Id.* at 12 (¶ 1.1.2); *see also id.* at 13 (¶ 3.1.1). A foundation providing for a level surface, on which rails were mounted, was to be supplied by PSNS, with enough track for each containment to be rolled completely clear of the workspace, toward the center of the ship's hull. *See id.* at 14 (¶ 3.2.1.3.1), 16 (¶ 3.2.4.1.1, ¶¶ 3.2.4.2.1–.2, ¶ 3.2.4.2.3.1), 21. Universal was to provide a "caster/rolling assembly" for use on the tracks, as well as "[t]rack captivation mechanisms" that "prevent wind uplift issues." *Id.* at 16 (¶ 3.2.4.1.1).

Each containment was required to have "the roof and sidewalls be enclosed, with the two end walls having openings to allow for travel over installed equipment." JX 2 at 14 (¶ 3.2.1.3.1). The specifications explained that the dismantling work and ship configuration "require the capability to incrementally retract the sections into each other and then all sections travel clear of the opening in the hull which they are covering." *Id.* This relocation of the retracted containment was "to give access to the opening for overhead cranes to access equipment within the opening." *Id.* The specifications further explained: "Once the equipment has been serviced the enclosure sections would be expanded back over the opening, providing weather protection over the hull. The resulting containment shall provide a completely enclosed structure." *Id.* The end walls were to have openings, covered with flaps, that when opened had "a minimum opening height of 17 feet at the center," *id.* at 15 (Table 1), the same as the "minimum inside height" of the "covered clear space envel-

ope." *See* JX 2 at 12 (¶ 1.1.1), 23 (Enclosure 3). A required feature of the containments was the "[f]ull opening of end wall to allow equipment & material access." *Id.* at 15 (Table 1).

Among the design requirements was that "[e]ach containment shall be designed and constructed to withstand loading in accordance with the Uniform Building Code (UBC) for the Bremerton Washington region ('Exposure D', 83 mph)." *Id.* at 16 (¶ 3.2.5.1).[1] The specification reiterated this wind exposure requirement, which it described as the "level of wind severity," stating that "[t]he containment and associated foundation shall be designed to meet UBC 'Exposure D.'" *Id.* at 17 (¶ 3.2.5.1.2). Under the heading of "Rolling contingency," however, the specification explained: "Full wind load shall be assumed to be applied to the containment when stationary. Contractor shall provide a recommended reduced wind speed which may be used for periods of containment relocation (that is, when containment is rolled to a new position)." *Id.* (¶ 3.2.5.1.3).

The containment was also required to "be designed to allow crane lift of the individual fully assembled sections which makes up each containment unit." JX 2 at 13 (¶ 3.1.2.1); *see also id.* at 18 (¶ 3.3.1.1). The contractor was required to provide the "full rigging procedure" for moving the sections by crane, *see id.* at 18 (¶ 3.3.3.1), 20 (unnumbered paragraph), including any "applicable limitations" such as "wind conditions or other factors." *Id.* at 18 (¶ 3.3.3.2), 20 (unnumbered paragraph). This procedure was among the required "submittals" that the contractor was to deliver *"within 10 working days* after date of award." *Id.* at 19 (¶ 3.5) (emphasis in original). The other submittals included shop drawings identifying "detailed structure assembly," JX 2 at 19 (¶ 3.5.1); "[f]ull instructions for assembly and disassembly of the containment and foundation," *id.* (¶ 3.5.3.1); instructions for the use

of the end wall openings and for "movement of the containment," including any applicable "[l]imitations on maximum wind speed while relocating (that is, rolling) containment," *id.* (¶ 3.5.3.2); and "[e]ngineering calculations documenting the structural design meets the requirements of this specification." *Id.* (¶ 3.5.4). Both "[t]he design of the containment," JX 2 at 17 (¶ 3.2.5.1.4), and the engineering calculations were required to be "'sealed' by a registered professional engineer." *Id.* at 19 (¶ 3.5.4).

Under the contract, Universal was to "provide all material" for the containment units. *Id.* at 12 (¶ 1.2.1), 13 (¶ 3.1.2). The shipyard was to provide the labor and equipment to assemble and install the containments, *see id.* at 12 (¶ 1.2.2.1), 13 (¶ 3.1.2.2), 19 (¶ 3.4.2.1.2), and Universal was to "provide an on-site technical representative to provide guidance or resolve problems for the duration of the containment assembly and installation phases." *Id.* at 19 (¶ 3.4.2.1.1); *see also id.* at 13 (¶ 3.1.2.3) (providing that technical representative was "to aid Shipyard employee assembly and installation of each containment").

A modification to the contract was issued on March 1, 2000, *see* JX 5 at 1, to allow Universal to use material employing a different method of corrosion protection than the specifications required. The modification explained that "[i]n the interest of maintaining the urgent delivery and installation schedule, the Government accepts Universal's proposed tubing product in lieu of the hot-dip galvanized process of specification paragraph 3.2.6.2." *Id.* at 2. The modification also extended the delivery date of the containment units to March 8, 2000, and the completion date for technical representative assistance to March 13, 2000. *Id.*

## B. Performance and Termination[2]

On February 7, 2000, exactly ten working days from the date of contract award, Universal sent by facsimile some of the submit-

---

1. According to the UBC, Exposure D "represents the most severe exposure in areas with basic winds speeds of 80 miles per hour ... or greater." DX 3 at 1. It applies to areas having "terrain which is flat and unobstructed facing large bodies of water over one mile ... or more in

width relative to any quadrant of the building site." *Id.*

2. This portion of the opinion contains findings of fact pursuant to Rule 52 of the Rules of the United States Court of Federal Claims ("RCFC").

tals required by the specifications. *See* JX 4; JX 2 at 19–20. This submission included drawings of the containment sections and the track captivation mechanism, JX 4 at 4–13, assembly instructions and at least partial rigging instructions. *See id.* at 15–20. The limitation on maximum wind speed when relocating a containment was also supplied, as the instructions stated "never attempt to unlock or un-anchor the shelters in order to change position in winds of (10) knots or higher." *Id.* at 20.[3]

The Contracting Officer ("CO") sent a response the next day, addressing some questions posed by Universal, *see* Def.'s Ex. ("DX") 10 at 1–2, and informing the contractor that the shop drawing for the largest containment section showed that the section exceeded the specifications' maximum height limit by nineteen inches. *See id.* at 2 (citing Enclosure 3); *see also* JX 2 at 23 (Enclosure 3). The CO's response also questioned whether the proposed tubing's "hot-dipped zinc coating" met the specification that the material be "hot-dipped galvanized," DX 10 at 3—the issue which ultimately was resolved by the contract modification. *See* JX 5 at 2. And the CO began her response to Universal's request that the government provide signed approval of the shop drawings by noting: "While the wording of the specifications is to deliver Engineering calculations documenting the structure design, it is not the Shipyard's intent to analyze these calculations and approve them, but to have them for reference." DX 10 at 2. The CO went on to explain that Universal was "responsible for that data and reliable design," a responsibility that was "re-enforce[d]" by the specifications requiring "that the designs are certified." *Id.* The two provisions requiring documents "be 'sealed' by a registered professional engineer" were then quoted. *Id.* (citing specifications ¶¶ 3.2.5.1.4 and 3.5.4). Although the drawings did not appear to have any "seal" of a registered professional engineer, *see* JX 4 at 4–13, and the February 7 submission did not include engineering calculations, the CO made no com-

ment on these shortcomings. *See* DX 10 at 1–3.

On or after February 16, 2000, a set of engineering calculation sheets—including supporting materials and computer printouts—generated by Universal's architect, Glenn A. Morrison of the firm Architecture North, Ltd., was also submitted by Universal. *See* JX 3; Tr. at 366–68. The parts for the containment units were not delivered by March 8, 2000, but instead arrived between March 13 and March 27. *See* DX 25; DX 27 at 2; Tr. at 372; *see also* DX 52 at 2 (stating that first delivery arrived March 14, 2000). Universal's president, Vaughn S. Fudge, was at PSNS serving as the technical representative until the last shipment of parts arrived, and then Universal employee Tommy Wester took over this role. *See* Tr. at 372–73; DX 24.

On March 30, 2000, the CO sent Universal a letter informing the contractor of purported "deficiencies" which were "endangering performance of this contract." DX 27 at 3. These included assembly instructions which the Navy found inadequate, *id.* at 1; a "vague" parts list and no inventory list for the material received, "making it impossible to identify" pieces, *id.;* problems with the rollers, *id.* at 2; tubing that was dented or creased during shipping, *id.;* and the discovery that the slip joints "will not stay closed" for an assembled middle, 50–foot wide containment section. *Id.* The CO stated that the Navy did "not have an accurate inventory of the individual pieces required to assemble any given section," and did "not posses[s] sufficient documentation to assemble [the structures] on [its] own." DX 27 at 2. The Navy requested that the on-site representative remain at PSNS until one entire containment were completed; that Universal provide an "accurate and complete material/parts list" which sufficiently identifies the color-coding scheme used for the parts; and that the contractor supply a "more detailed assembly instruction." *Id.* at 3.

Also on March 30, 2000, Brian A. Peterson, a PSNS structural engineer who worked on

---

**3.** In this and other communications, Universal followed the convention of using all capital letters. For ease of reading, when quoting from such documents the Court will convert the text to lower case when appropriate, following the normal rules of grammar.

the ship dismantling projects, sent an e-mail to Universal informing the contractor of "[a] major concern" over the restriction on moving the containments in winds of ten knots or higher. DX 28. The PSNS personnel who would be using the containments felt "that 20 mph is their minimum tolerable allowance for re-positioning the structures," and thus the Navy "request[ed] reconsideration o[f] this requirement to allow optimal use of the structures." *Id.*[4] The next day, Mr. Fudge spoke with Mr. Peterson on the phone and stated that the structures could be moved in 20 mile per hour winds. DX 30. This was confirmed in an e-mail which Universal sent to the CO, but addressed to Mr. Peterson, on April 7, 2000. *See* JX 7. In this e-mail, Mr. Fudge explained that he "review[ed] the calculations concerning the relocation of the shelters," and determined that if the track captivation mechanism were "attached firmly to the shelter and to the rail," and "some sort of braking device" were used "to keep the end panel shelter from pulling away from the personnel moving the shelter," with the ends open "the shelter can be relocated along the rail in winds up to 18 knots (or just over 20 mph)." *Id.* Universal also informed PSNS that it was "in the process of rewriting the assembly and disassembly instructions, along with the rigging and relocation instructions." *Id.*[5]

The previous day—April 6, 2000—in the presence of Mr. Wester, the middle (50–foot wide) section of the first containment being assembled was lifted by crane and placed on the deck of the cruiser CGN 39 (the former USS Texas). *See* Tr. at 122–24, 194, 378, 384; DX 33–13; DX 33–16. The 50–foot section was attached to the rolling track installed on the deck, *see* Tr. at 124, and anchored to the deck by three chains on each side wall, attached on the outside of the track captivation mechanism. Tr. at 130; DX 38–19. Since middle sections of the containment do not have end walls, this section was open at both ends, and thus only partially enclosed

as fabric covered just the sides and top. *See* DX 33–16. Within the next week the largest (53–foot wide) section of that containment was fully assembled and sitting on a pier, scheduled to be installed on the CGN 39 the following Monday, April 17, 2000. DX 37. This section was "held down using cables attached to several docking keel blocks." DX 43 at 1. Its end wall was partially enclosed, with the bottom portion of the fabric end panel serving as the soft flap or door, and thus just one end of this section was fully open. *See* Tr. at 132–33.

When PSNS personnel arrived at the shipyard the morning of Friday, April 14, they discovered that overnight winds had taken a toll on both assembled sections. The 50–foot section on the deck of the CGN 39 was leaning to the east, its frame appearing bowed or flattened in places. Tr. at 125–29; DX 37; *see* DX 38–2; DX 38–8. Part of the structure leaned over the rail to which it was attached, and PSNS personnel felt this was "somewhat precarious" as the utility lines to the ship were directly below. Tr. at 126. Some of the slip joints in the frame had come apart, and a later inspection showed that a horizontal piece of one of the side wall's H-frames appeared bent. Tr. at 129, 137–39; *see* DX 38–16; DX 45–8. Mister Wester noted that the section appeared to be swaying in the wind. Tr. at 188–89. The 53–foot section on the pier had its fabric end panel blown mostly off, with many of the grommets which had attached it to the wall torn away. Tr. at 132–34; DX 43; *see* DX 41–7; DX 41–19. Some of the slip joints of that section's frame had also come apart. Tr. at 131–32; *see* DX 41–3. Jeffrey M. Avery, the government's Point of Contact ("POC") for the contract, *see* JX 2 at 6; Tr. at 106, consulted the National Weather Service website and determined that Bremerton wind speeds from the night of April 13, 2000 through the morning of April 14, 2000 were 18 to 20 miles per

---

4. Mister Peterson also stated his desire "to get a few clarifications on portions of the engineering calculations submitted for the shelters." DX 28. He asked that "the originator of the calculations" either contact him, or that he be given contact information and permission to contact Universal's "engineering firm" himself. *Id.*

5. In the e-mail, Universal also gave the PSNS engineers permission to contact directly Mr. Morrison, described as its "engineer," and provided his phone number. *See* JX 7.

hour, with 23 mile per hour gusts. Tr. at 128; DX 37; *see also* DX 36.

Concerned that the winds that were persisting on April 14 might cause the containment section on the deck of CGN 39 to buckle and possibly be blown off the ship's deck and onto the pier, PSNS decided to close down the pier. Tr. at 68, 135–36; *see* DX 37; DX 39. The utilities to the pier were shut down, and the end of the pier was roped off and manned with a guard shack. Tr. at 68–69, 135–36. The pier was reopened the following Monday, April, 17, 2000. Tr. at 85–86. The next day, the 50–foot section was removed from the ship and placed on the pier, *see* DX 99 at 51; DX 52 at 3, and by the morning of April 19, the fabric skin had been removed from that section. Tr. at 137–38; *see* DX 45–8.

That Friday, April 21, the CO sent Universal a cure notice, informing the contractor that the government considered the two sections' wind damage to represent a "failure of [the] Containment to comply with the specification requirements," and thus "a condition that is a failure to perform in accordance with the specifications of the contract." JX 8 at 1. This result of 18–20 mile per hour winds, the government believed, showed that the containment failed to meet the required ability to withstand 83 mile per hour winds. *Id.* (citing specifications ¶ 3.2.5. 1); *see* JX 2 at 16 (¶ 3.2.5.1). The cure notice detailed the government's assessment of the damage to the two sections, *see* JX 8 at 1, noted that "the wind speed that resulted in the failure was nowhere near that which the contract specifications required the containment to withstand," *id.* at 2, and then reproduced the design requirements from the contract's specifications. *Id.* (quoting specifications ¶¶ 3.2.5–3.2.5.1.4). The CO added that Universal had yet to provide the accurate parts and materials list, the color-coding identification, and the more detailed assembly instruction that were requested in her March 30 letter. *Id.; see* DX 27 at 3. The cure notice required Universal "to demonstrate that [it] can provide the Containments in accordance with the specification requirements of the contract," and informed Universal that the government may terminate the contract for cause "unless this condition is cured within 10 days after receipt of this notice." JX 8 at 3.

Universal responded that same day with a letter from its president, sent by facsimile, informing the government that the contractor was "taking the necessary steps to solve the situation." JX 8 at 4. Mister Fudge stated that Mr. Morrison was "reviewing all engineering" and that they were "waiting to receive the pictures to help us understand what happened." *Id.* The letter also stated that the "accurate and complete" material and parts list was "available" but had been "put … on hold" until the cure notice was received, and would be sent the following Monday. *Id.* Mister Fudge closed by explaining that at that time, he did "not understand the proposed failure, but as soon as we have researched an engineered and sound solution, we will make recommendations to allow us to solve this situation." *Id.*

One week later, Universal sent its response to the cure notice. JX 9 at 1. Mister Fudge provided updated assembly and disassembly instructions which incorporated his and Mr. Morrison's recommendations. *See id.* Universal explained that its "structure was engineered and designed to work as a closed structure and, as in all cases of construction, precautions must be taken to prevent damage during construction." *Id.* The contractor implicitly criticized the Navy's decision to place the open-ended, 50–foot section on the ship before either of the sections with an end wall was ready to be installed. Universal stated that it had "never built a 3–phase shelter where any phase of the building process was not protected from weather" or where "any part of the shelter had to stand alone for a week at the time waiting on someone to complete the next section." *Id.* The contractor requested that it be allowed to provide three representatives to work with three PSNS labor personnel to implement its recommendations; that it be provided an on-site location for welding; and that it be allowed either to use "the PSNS vinyl fabrics operation" or to have the end panels shipped back in order to reinforce them. JX 9 at 2.

Universal included Mr. Morrison's recommendations in its submission. JX 9 at 10–11.

He had four suggestions. The first was that "[t]he hoop construction 'slip joints' must be fully welded." *Id.* at 10. He explained that this welding was "required" for these joints "to withstand" what he called "bending forces." *Id.* The second was that the chain anchors attached to the track captivation mechanism be "doubled with the chains opposing one another thereby maintaining support no matter which direction the wind force is from." *Id.* Mister Morrison's third recommendation read:

> Most importantly, the structure is designed as a closed structure. When under construction or open ended, four temporary diagonal brace cables should be installed. Attach the cables at the 3rd stringer and across to the opposite ground slide forming 2 'x's.

*Id.* at 11. His fourth recommendation recognized "there is evidence of some material yield at the upper slip joints," and suggested that reinforcing tubes "be welded to the joint members and spanning from spacer to spacer." JX 9 at 11.

Universal's revised and more detailed assembly instructions included the welding of the arches' slip joints. JX 9 at 7. They also identified the parts that were colored with blue, purple, green, black and rose paint. *See id.* at 3–4, 6–8. The revised instructions included this note:

> When the shelter is in the construction process, all precautions should be taken to protect the uncompleted shelter from damage. All engineering has taken into account the fact that this shelter operates as a closed shelter and not as (3) separate entities. The 3–point anchoring device on each side should have chain locks on each side of the ASCE rail. Cables should criss-cross the shelter while waiting for the other (2) shelters to join them. All precautions should be taken to secure the individual shelters until such time as they operate either in a spread condition of 2' overlap or in the stacked and closed position of 20' total.

*Id.* at 8.

On May 18, 2000, the CO issued her notice of termination for cause. JX 10 at 1–2. The government had concluded that Universal's April 28 response "failed to cure those conditions which the Government had determined are endangering performance of the contract." *Id.* at 1. The CO noted the "failure of the two containment sections resulting from wind speeds between 18–20 MPH," in light of the required ability to withstand 83 mile per hour winds, and stated that "[i]nspection of the damaged units showed deflection/racking problems, truss un-mating, frame buckling and end panel tearing." *Id.* Only two of Universal's recommendations were mentioned—the proposed diagonal cross-bracing and the doubling of the anchor chains—and only the former was criticized. *Id.* The CO stated that the diagonal brace cables would violate the "clear span" that was required by paragraphs 1.1.1 and 3.2.1.3.1 of the specifications, interfering with a "jib" crane, and would also violate the requirement that the containment "be able to incrementally retract the sections into each other." *Id.* The government determined that Universal failed to provide containments meeting the contract specifications, failed to provide assurances that these specifications would be met, and "gave no excuses that failure to perform was beyond [Universal's] control, and without [its] fault or negligence." JX 10 at 2. The contract was terminated, effective that date, and Universal was "advised" that "supplies and services required under the reprocurement effort may be purchased in the open market against Universal Shelter's account," with Universal "held liable for any excess costs." *Id.*

## C. Procedural History

Universal submitted to the CO a certified claim, dated November 30, 2000, requesting that the termination for cause be converted to a termination for convenience, and seeking an award of $233,000 for its expenditures under the contract. JX 11. The contractor argued that termination for cause was improper, contending that its containment structures, its assembly and disassembly instructions, and the aid of its on-site representative all met the contract specifications. JX 11 at 7–8. Universal further contended that unqualified and inexperienced Navy personnel "assembled and erected the structures in

a haphazard and incorrect manner" and did not follow the assembly instructions. *Id.* at 8. It argued that the Navy would not allow it to inspect the structures after the "alleged wind damage" of April 14 to facilitate a response to the cure notice. *Id.* Universal contended the Navy "failed to provide clear direction" regarding the Navy's problems assembling and erecting the containments, failed to provide adequate equipment to anchor the structures, and "refused to consider or implement the evaluations and recommendations" that Universal submitted in response to the cure notice. *Id.* These same grounds were advanced to support Universal's claim that the Navy failed to cooperate and perform adequately to satisfy the implied duty of good faith and fair dealing, to which Universal added the allegation that "the Navy decided when it issued the Cure Notice that it would terminate Universal Shelters regardless of Universal Shelters' response." JX 11 at 9–10. Universal also contended that it substantially complied with the contract requirements, *id.* at 9, and that the Navy violated a duty to request a verification of a bid which appears to contain a mistake. *Id.* at 10.

On December 4, 2000, Universal filed its complaint in this Court. This complaint contained almost verbatim the allegations and arguments that were raised in the certified claim, including the four counts of improper termination, substantial compliance, violation of the implied duty of good faith and fair dealing, and violation of the duty to verify bids. *See* Compl. ¶¶ 46–69. The major difference between the certified claim and the complaint was that Universal was not seeking an award of damages from our Court. Instead, it sought a judgment converting the termination for cause into one for convenience, and merely "a declaration that Universal Shelters is entitled to appropriate monetary relief." Compl. at 11–14.

The CO, on May 23, 2001, issued a final decision demanding that Universal pay contract debt totaling $86,908.70, stemming from the termination for cause. DX 97 at 1–5. This debt included $20,454.28 in reprocurement costs, based on the difference between the price paid by the Navy to buy two con-

tainments from another vendor, and the price it would have paid Universal for the four containments under the contract. *See id.* at 1; *see also* Tr. at 64–65, 68, 76. Incidental costs of $66,454.42 were also demanded, based on the Navy's calculation of the costs resulting from the safety problems caused by the wind-blown section on the ship, the costs of removing that section from the ship, and the costs of dismantling it; the costs of PSNS labor used to assist Universal in removing the contractor's material from the pier; the costs to PSNS of assembling the Universal structures; and a ten percent surcharge representing the associated demands on PSNS management, safety, and technical support personnel. DX 97 at 2.

On October 3, 2001, Universal filed an amended complaint, adding the allegation that its certified claim should be deemed denied due to the CO's inaction, and the request for an award of damages of at least $233,000 plus interest, costs, and attorney's fees. *See* Am. Compl. ¶¶ 46–47, 54, 60, 66, 72. Universal also sought to appeal the government's contract debt claim, adding a count that would deny the claim on the basis that the termination was improper and should be converted to one for convenience. Am. Compl. ¶¶ 48, 73. The government's answer, filed October 15, 2001, included a counterclaim requesting the $86,908.70 in excess reprocurement and incidental costs. Def.'s Answer to Am. Compl. & Def.'s Countercl. ¶¶ 75–80.

The following month, the government moved for summary judgment. *See* Def.'s Mot. for Summ. J. After plaintiff's original counsel withdrew from the case and new counsel was substituted, briefing on this motion was completed, a hearing was held, and the motion was granted in part and denied in part. *See* Order (May 8, 2003). Summary judgment was granted to the government on Universal's fourth count, which alleged a violation of the duty to verify bids. *Id.; see* Tr. (May 7, 2003) at 25 (finding no evidence that CO had knowledge of a bid error, and that Universal's bid was higher than the government's estimate). Plaintiff's fifth count, challenging the demand for reprocurement and incidental costs, was dismissed by the Court

as a claim for relief, and instead treated as a reply to the government's counterclaim. Order (May 8, 2003) (citing RCFC 7(a)). Three months later, just before the close of discovery, the case was reassigned to the undersigned, pursuant to RCFC 40.1(c). Order (Aug. 15, 2003).

One day after filing its pre-trial memorandum and witness and exhibit lists, the government filed a motion to dismiss Universal's claim for money damages, under RCFC 12(b)(1). *See* Def.'s Mot. to Dismiss. The government argued that this Court lacked subject matter jurisdiction over that portion of the case, on two grounds. The first was an ill-supported contention that Universal's November 30, 2000 submission was not a certified claim, but rather a termination for convenience settlement proposal. *See id.* at 1–6. The government stated this as a "fact," *id.* at 1, and based the assertion on "the termination for convenience clause in the contract." *Id.* at 5. The clause was not identified nor its substance quoted. *See id.* at 1–6. The only authority cited to support this proposition was the Federal Circuit's decision in *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537 (Fed.Cir.1996). Def.'s Mot. to Dismiss at 6 (citing *James M. Ellett Constr.*, 93 F.3d at 1543–44). That case turned on the specific settlement proposal language of 48 C.F.R. § 52.249–2. *See James M. Ellett Constr.*, 93 F.3d at 1540. But, it turns out, Universal's contract incorporated a different clause for commercial items, 48 C.F.R. § 52.212–4, *see* JX 2 at 5, which contained no similar language. *See* 48 C.F.R. § 52.212–4 (2000).

The government's second argument was that the CO was divested of the authority to rule on the certified claim once Universal filed its initial complaint in our Court. *See* Def.'s Mot. to Dismiss at 2, 6–8. Defendant contended that the original complaint contained "the identical claim" as that raised before the CO, *id.* at 2, and that the latter could not be deemed denied after the passage of sixty days, as the exclusive authority to act on the claim rested with the Attorney General once it became the subject of litigation. *Id.* at 8 (citing, *inter alia*, *Sharman Co. v. United States*, 2 F.3d 1564, 1571–72 (Fed.Cir.1993); 28 U.S.C. §§ 516–20).

As the motion to dismiss was filed just 18 days before the trial was to begin, the Court held a status conference to determine if the plaintiff wished to expedite the filing of its response, in order to maintain the trial date. Due to the significance of the motion, Universal opted for the full time period allowed for a response under our rules, *see* RCFC 7.2(c), and as a consequence the pretrial conference and trial were postponed. *See* Order (Feb. 11, 2004). No response was received by the deadline; a few weeks later Chambers contacted plaintiff's counsel to determine if the document was lost, and was informed that a paper would be filed shortly. *See* Order (May 20, 2004) at 1.[6] Several weeks passed with no filing from plaintiff. In the meantime, the government filed a status report indicating that plaintiff's counsel failed to respond to its inquiry as to whether the motion to dismiss was being opposed, and requested a status conference on the matter. *See* Def.'s Stat. Rep. & Req. for Stat. Conf. (Apr. 14, 2004) at 1–2. This elicited no response from plaintiff. The Court finally issued an Order to Show Cause, requiring plaintiff to file by May 12, 2004 "a justification for its failure to respond to the motion to dismiss," and any motion seeking leave to file such an opposition out of time. *See* Order to Show Cause (May 5, 2004) at 2. A status conference to discuss the matter was scheduled to be held by telephone on May 17, 2004. *Id.*

No response to the Order to Show Cause was received by the Court. At the appointed hour for the status conference, it was discovered that plaintiff's counsel was out of the office, apparently participating in a trial. *See* Order (May 20, 2004) at 2. Later that day he called Chambers and stated he never received a copy of the Order to Show Cause, which was mailed and faxed to his office. *Id.* at 2. The next day, the government filed a motion to dismiss Universal's complaint for

---

6. More than one order was issued on May 20, 2004. The one cited in this opinion is docket entry 82.

failure to prosecute, under RCFC 41(b). Def.'s Mot. to Dismiss for Failure to Prosec. Two days later, the Court granted defendant's initial motion to dismiss Universal's claims for money damages on the basis of plaintiff's lack of opposition. Order (May 20, 2004) at 2. In this order, the Court noted the possibility that the government's *Sharman* argument could also apply to the counterclaim for procurement and incidental costs. *Id.* (citing *Sharman*, 2 F.3d at 1568–72). The Court also set a status conference to discuss plaintiff's counsel's disregard of Court orders, as well as the pending RCFC 41(b) motion. *Id.*

Plaintiff's then-counsel appeared for the status conference, and reiterated that he had not received a copy of the Order to Show Cause. Tr. (May 27, 2004) at 8–10. He explained that no response was submitted to the RCFC 12(b)(1) motion to dismiss, because his research yielded no sufficient ground for opposition. *Id.* at 8. The Court raised with government counsel the concern that the CO might have lacked jurisdiction to issue the demand that was the basis for the counterclaim, under the interpretation of *Sharman* propounded by defendant. *See id.* at 17–18, 20–21, 24–25. The Court also clarified that the order granting the motion to dismiss the money damages portion of plaintiff's case was based on the argument that the CO was divested of jurisdiction once the complaint was filed, and not on the settlement proposal argument—as the contract clause upon which the latter argument rested was never identified. *Id.* at 26.

When plaintiff's response to the RCFC 41(b) motion failed to contain the detailed information requested by the Court at the prior status conference, plaintiff's counsel was given one final opportunity to comply with the Court's request. *See* Order (July 22, 2004). Plaintiff's counsel finally submitted a satisfactory declaration, and the government's motion to dismiss for failure to prosecute was denied. Order (Aug. 9, 2004). The matter was then re-set for trial. *See* Order (Sept. 17, 2004).

## D. The Trial

Ultimately, a two-day trial was held in this case, on the propriety of the decision to terminate for cause and on the counterclaim for reprocurement and incidental costs. Defendant called four witnesses: Rebecca Jo Pastorella (formerly Jorden), the CO for the Universal contract, *see* Tr. at 15, 19; Jeffrey M. Avery, an electrical engineering technician who was the government's technical POC for the Universal contract, *see* Tr. at 100–01, 106; JX 2 at 6; Brian A. Peterson, a PSNS structural engineer who worked on the ship dismantling projects, *see* Tr. at 198–202; and Jeffrey L. Grover, who was retained as an expert in civil engineering. *See* Tr. at 279–87; *see also* DX 102 (Mr. Grover's expert report). The government also read into the record portions of the deposition testimony of the late Tommy Wester, who served as Universal's on-site technical representative in late March and April, 2000. Tr. at 184–97; *see also* DX 99. Plaintiff's sole witness was its president, Vaughn S. Fudge. *See* Tr. at 352.

During the trial, Ms. Pastorella testified as to the process she followed in making the determination to terminate the contract for cause, *see* Tr. at 29–55, which included relying on the technical and engineering support of Messrs. Avery and Peterson. *See id.* at 30–31. She also explained how the government derived the reprocurement and incidental costs demanded in its counterclaim. *See* Tr. at 55–77. Mister Avery described the specifications for the Universal contract, which he drafted, Tr. at 106–12; the wind damage suffered by the assembled containment sections the night of April 13 and morning of April 14, 2000, Tr. at 124–39; his assessment of Universal's response to the cure notice, Tr. at 140–56; and the process and costs of dismantling and removing Universal's material from the pier. Tr. at 158–73. Mister Peterson explained the engineering review of the Universal structures that he performed, Tr. at 206–217, 235–36, and provided his assessment of Universal's response to the cure notice. Tr. at 218–24. Mister Grover explained the basis for his conclusion that the Universal structures were not designed to withstand the wind speeds required by the specifications, identifying specific methodological and mathematical er-

rors he believed Mr. Morrison made in his engineering calculations, *see* Tr. at 291–319, and also criticized Universal's proposed cures. *See* Tr. at 320–32.

Mister Fudge explained how Universal and its architect, Mr. Morrison, continued to revise the design of the structures right up to the time of delivery, due to the specifications' severe wind requirement. Tr. at 364–67, 398–99, 419, 421. He testified that he felt he did not receive the amount of cooperation and communication from the Navy that he had expected based on his experience with other government contracts. *See* Tr. at 369–71, 374–75, 377, 379–82, 392–94, 405, 408. Mister Fudge believed that PSNS favored the containment structure it earlier bought from one of Universal's competitors. Tr. at 362–63, 377, 408. He thought the Navy was negligent in assembling and installing the containment sections, and that the reason the wind had the effect it did was the Navy's failure to properly secure the individual sections. *See* Tr. at 373–74, 379, 381–82, 384, 427. Universal's president testified that neither he nor Mr. Wester were allowed to inspect the condition of the 50–foot section before it was removed from the ship's deck, and that the Navy misinformed him of the damage suffered by the structures. Tr. at 380, 383, 388–89. He explained that Universal understood the cure notice to be based on problems the Navy encountered when leaving individual sections of the containments in isolation from the other two sections, and not on any design problem regarding the fully-assembled containments. Tr. at 396–97, 403–04, 407. And Mr. Fudge testified that the engineering calculations that were used by Messrs. Peterson and Grover to assess the containments were preliminary ones, and that Universal submitted updated calculations reflecting the final design of the structures in mid-March, 2000. Tr. at 366, 368, 398–99, 419–20. The CO, however, testified that Universal did not include any updated engineering calculations with the revised design drawings that it submitted in March, 2000, and that the calculations Mr. Fudge characterized as preliminary were the only ones ever received by the Navy. Tr. at 429–31.

Before the parties filed their post-trial briefs, Chambers was informed that plaintiff's trial counsel had been terminated by his law firm and was in the process of being disbarred. Plaintiff's current counsel was substituted in as attorney of record, and the post-trial briefs were filed. In its post-trial brief, Universal asserted that the Court did not have jurisdiction over the government's counterclaim. Pl.'s Post–Trial Br. ("Pl.'s Br.") at 7–9. Plaintiff argued that, under *Sharman,* the CO had no authority to issue a final decision demanding the reprocurement costs once the termination for default was placed in litigation before this Court. *See id.* Universal attached as an exhibit to its post-trial brief a copy of what were purported to be the final engineering calculations that Mr. Fudge had referenced in his testimony. Ex. 1 to Pl.'s Br.; *see* Pl.'s Br. at 5 n. 1, 13 & n. 2. Plaintiff's jurisdictional argument was treated as a motion to dismiss under RCFC 12(b)(1), and the government filed a response. *See* Def.'s Resp. to Pl.'s Mot. to Dismiss ("Def.'s Resp."). Defendant also moved to strike the exhibit to Universal's post-trial brief, as untimely and irrelevant. Def.'s Mot. to Strike Pl.'s Ex. to Post–Trial Br. & Mot. for Leave to File a Resp. to Pl.'s Post–Trial Mot. to Dismiss ("Mot. to Strike"). Universal filed no opposition to the motion to strike, and no reply in support of its motion to dismiss the counterclaim.

## II. DISCUSSION

Universal argues that its containments fully met the specifications, as they were designed to withstand Exposure D winds once fully assembled and operated as closed structures. Pl.'s Br. at 2, 10–13. It contends that the specifications do not explicitly state that each of the three sections making up a containment must function independent of the others, or that the containments were to be installed with open ends, and that any ambiguities should be construed against the government, which drafted the specifications. *See id.* at 9–12. Plaintiff asserts that the government breached its duty to cooperate with a contractor, by not allowing Mr. Fudge to view the structure built by his competitor, *id.* at 15; by not promptly responding to Universal's requests for clarifications, and by

forcing communications to take place by letter, *id.*; by not providing a work force that could properly build the containments, *id.* at 15–16; and by not properly securing the assembled individual sections. Pl.'s Br. at 16. Universal argues that the structures were properly designed, but negligently assembled and installed by the Navy. *Id.* at 12–13, 15–16. It asserts that the engineering calculations based on the final design of the structures demonstrate they met the Exposure D wind requirement. *Id.* at 13.

Plaintiff also contends that its responsibility for the structures ended once they were placed on the ship, and that it viewed the cure notice as asking for help for a problem caused by the Navy. *See id.* at 15–18. It asserts that the Navy failed to provide enough information about the events of April 13 and 14 to allow it to respond adequately, and that the Navy had decided upon contract termination even before issuing the cure notice. *Id.* at 17–18. Universal argues that, to the extent that the termination decision rested on delays in performance, these delays were attributable to either the government's lack of cooperation or other factors beyond its control, such as problems with the trucks and the illness of one of the drivers delivering the material. *See id.* at 4, 18–19. And, as was noted above, it argues that the CO lacked authority to issue a final decision demanding reprocurement costs, Pl.'s Br. at 1, 7–9, and in addition contends the Navy's lack of cooperation resulted in the failure to reasonably minimize these costs. *Id.* at 20. Universal's position is that the termination for cause was improper, and must be converted into a termination for convenience. *Id.* at 12–13, 20–21; *see also* 48 C.F.R. § 52.212–4(m) (2000).

The government argues that termination for cause was proper, on the ground that Universal's structures did not comply with the specification requiring that they be able to withstand Exposure D wind conditions. Def.'s Post–Trial Br. ("Def.'s Br.") at 17–20. The CO considered the events of April 13 and 14, 2000, showing the effects of 20 mile per hour winds on the two assembled sections. *Id.* at 17. In making her decision, she took into account Mr. Peterson's determination that the middle section was not designed to withstand Exposure D winds. *Id.* at 7, 21–22. The government also contends that Universal's response to the cure notice contained proposals which violated the specifications, failed to cure the design flaws, constituted an admission of these flaws, and amounted to a substantial revision of the structure's design. *Id.* at 13–14, 22–25, 33. Thus, it argues, Universal failed to provide adequate assurances of future performance. *Id.* at 22–26. Defendant asserts that its expert has demonstrated that the calculations of Universal's architect were severely flawed by methodological omissions, Def.'s Br. at 9–12, and failed to meet the standard of care. *Id.* at 8, 12. Its expert concluded that Universal's design failed to meet the contract's wind loading specification. *Id.* at 8.

The government also contends that the contract required that the containments be operated with the ends opened, and not just as a closed structure. Def.'s Br. at 26–27. It asserts there is no evidence the shipyard workers incorrectly assembled or secured the containment sections that were wind-damaged, *id.* at 28–29, and that the assembly and installation occurred under the guidance of the Universal technical representatives, Messrs. Fudge and Wester. *Id.* at 4–5, 27–28. The government argues that the assembly process was slowed by the inadequate written instructions provided by plaintiff. *Id.* at 29. And it contends that it adequately cooperated with the contractor, extending the delivery dates and allowing Mr. Wester to examine the wind-damaged 50–foot section. *Id.* at 34–35.

## A. Applicable Law

 Government contracts disputes are adjudicated under normal principles of contract interpretation. *See McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1434–35 (Fed.Cir.1996); *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991). The purpose of interpreting a contract is, of course, to "accomplish the intention of the parties." *In re Binghamton Bridge,* 70 U.S. (3 Wall.) 51, 74, 18 L.Ed. 137 (1865); *see also Intergraph Corp. v. Intel Corp.,* 241 F.3d 1353, 1354 (Fed.Cir.2001); *Tecom, Inc. v.*

*United States*, 66 Fed.Cl. 736, 747 (2005). Federal regulations, however, in addition to case law, impose specific guidelines for the government's termination of a contract involving a commercial item acquisition.

### 1. Principles of Contract Interpretation

 The Court will interpret a contract in such a way as to give meaning to all the provisions of the contract in light of the parties' intent at the time they entered the agreement. *Tecom,* 66 Fed.Cl. at 747. A contract must be "interpreted so as to harmonize and give meaning to all of its provisions, and [thus] an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Arizona v. United States,* 216 Ct.Cl. 221, 235–36, 575 F.2d 855 (1978); *see also, e.g., Gould,* 935 F.2d at 1274; *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir. 1983); *Tecom,* 66 Fed.Cl. at 747.

 The Court will first consider the plain language of the contract's terms. *See, e.g., Forman v. United States,* 329 F.3d 837, 842 (Fed.Cir.2003); *Gould, Inc.,* 935 F.2d at 1274. If a contract term is clear and unambiguous, the Court will adopt its plain and ordinary meaning. *See, e.g., Moran v. Prather,* 23 Wall. 492, 90 U.S. 492, 499, 23 L.Ed. 121 (1874); *McAbee Constr.,* 97 F.3d at 1435; *see also Elden v. United States,* 223 Ct.Cl. 239, 250–253, 617 F.2d 254 (1980); *Tecom,* 66 Fed.Cl. at 748. "A contract term is unambiguous if there is only one reasonable interpretation." *C. Sanchez & Son, Inc. v. United States,* 6 F.3d 1539, 1544 (Fed.Cir. 1993); *see also Edward R. Marden Corp. v. United States,* 803 F.2d 701, 705 (Fed.Cir. 1986). The plain meaning of a contract term is "the meaning derived from the contract by

a reasonably intelligent person acquainted with the contemporary circumstances." *Firestone Tire & Rubber Co. v. United States,* 195 Ct.Cl. 21, 30, 444 F.2d 547 (1971); *see also Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 388, 351 F.2d 972 (1965); *Tecom,* 66 Fed.Cl. at 748. The Court, then, will employ the ordinary meaning of the words used in an agreement unless there is evidence that the parties meant otherwise—for instance, through the adoption of a special definition—or if the term is ambiguous, in which case the Court will interpret the contract according to whether the ambiguity is patent or latent.[7] *Tecom,* 66 Fed.Cl. at 748; *Hol–Gar,* 169 Ct.Cl. at 390, 351 F.2d 972; *L. Rosenman Corp. v. United States,* 182 Ct.Cl. 586, 589–90, 390 F.2d 711 (1968).

 Courts interpret latent ambiguities in a contract against the drafting party. *Interstate Gen. Gov't Contractors, Inc., v. Stone,* 980 F.2d 1433, 1434 (Fed.Cir.1992); *SIPCO Servs. & Marine, Inc., v. United States,* 41 Fed.Cl. 196, 215 (1998). This rule has been held to apply with extra vigor when the drafting party is the government. *See United States v. Seckinger,* 397 U.S. 203, 216, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970); *SIPCO,* 41 Fed.Cl. at 215.

### 2. Terminating Contracts for Commercial Items

Provisions of the Federal Acquisition Regulation ("FAR") govern the termination of a contract for commercial items. *See* 48 C.F.R. § 12.403. The FAR also contains terms which the government and Universal incorporated into their agreement by reference. *See* JX 2 at 5; 48 C.F.R. § 52.212-4. One of these terms includes a provision stating:

> The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or

---

7. A patent ambiguity in a contract is one that is, on its face, glaring and obvious, while a latent ambiguity is not so obvious and requires the Court to adopt the *contra proferentem* rule—construing an ambiguity against the drafter. *Compare Beacon Constr. Co. of Mass. v. United States,* 161 Ct.Cl. 1, 7, 314 F.2d 501 (1963) (a patent ambiguity involves "an obvious omission, inconsistency, or discrepancy of significance"), *and*

*WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. 1, 6, 323 F.2d 874 (1963) (a patent ambiguity is "an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap"), *with Newsom v. United States,* 230 Ct.Cl. 301, 303–04, 676 F.2d 647 (1982), *and Peter Kiewit Sons' Co. v. United States,* 109 Ct.Cl. 390, 418 (1947); *see also United States v. Seckinger,* 397 U.S. 203, 216, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970).

if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

48 C.F.R. 52.212–4(m) (2000).

 The decision to terminate a contract for default [8] lies within the discretion of the contracting officer. *T & M Distrib. v. United States*, 185 F.3d 1279, 1283 (Fed.Cir. 1999). The contracting officer must exercise this discretion to ensure that the termination satisfies the Government's "best interests." 48 C.F.R. § 12.403(b); *Nuclear Rsrch. Corp. v. United States*, 814 F.2d 647, 649 (Fed.Cir. 1987). Such discretion "must be fair and reasonable, not arbitrary or capricious." *Darwin Constr. Co. v. United States*, 811 F.2d 593, 597 (Fed.Cir.1987) (citation omitted); *see also Consol. Indus. v. United States*, 195 F.3d 1341, 1343–44 (Fed.Cir.1999) ("The contracting officer has broad discretion to determine whether to terminate a contract for default and we will only overturn that decision if it is arbitrary, capricious or constitutes an abuse of discretion.") (citation omitted).

 The FAR requires a contracting officer to send a cure notice to the contractor prior to terminating a contract for reasons other than late delivery. 48 C.F.R. § 12.403(c)(1). If the contractor does not satisfactorily respond to the cure notice, the response itself may justify a termination for default. *See Int'l. Verbatim Reporters, Inc.*

*v. United States*, 9 Cl.Ct. 710, 723 (1986). Upon receiving a cure notice, a contractor wishing to avoid default must provide adequate assurances to the Government that it can complete the contract requirements in a timely manner. *SIPCO*, 41 Fed.Cl. at 220.

 The government bears the burden of showing that a termination for default was justified. *Lisbon Contractors v. United States*, 828 F.2d 759, 765 (Fed.Cir.1987). The government must reasonably demonstrate that the contractor's deficient performance is the actual cause of the termination and not a mere pretext. *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1326 (Fed.Cir.1999); *Keeter Trading Co. v. United States*, 79 Fed.Cl. 243, 252 (2007). One relevant consideration is the failure of the contractor to meet contract specifications. *McDonnell Douglas*, 182 F.3d at 1328. Once the government has established that the contractor's deficient performance was the cause of the termination, the burden shifts to the plaintiff to demonstrate that the default was excusable. *Keeter Trading*, 79 Fed.Cl. at 253. At this stage the plaintiff must show that the causes of the default were beyond its control and not due to its fault or negligence. *Switlik Parachute Co. v. United States* 216 Ct.Cl. 362, 372–73, 573 F.2d 1228 (1978); *Southeastern Airways Corp. v. United States*, 230 Ct.Cl. 47, 63, 673 F.2d 368 (1982).

*3. Complying with a Contract's Requirements*

 Proof of substantial compliance with a contract's terms precludes a summary default termination for minor defects or those easily corrected, if the goods or services are timely delivered. *Radiation Tech. v. United States*, 177 Ct.Cl. 227, 231–33, 366 F.2d 1003 (1966). Under this doctrine, the contractor must "demonstrate that he had reasonable grounds to believe that his delivery would conform to contract requirements," and that

---

**8.** Section 52.212–4(m) of the FAR suggests that "default" is just one subset of "cause," by use of the disjunctive ("any default by … or if the Contractor fails to comply … or fails to provide …"), and one could read the termination for convenience backstop as not applying when the "cause" is failure to comply with contract terms. It is clear from other provisions that default is

meant to be synonymous with cause. *See, e.g.,* 48 C.F.R. § 12.403(c)(2) (referring to contractor subject to termination for cause as "the defaulted contractor"); *see also Harris Corp. v. Giesting & Assocs.*, 297 F.3d 1270,1272 (11th Cir.2002) (noting under common law termination for cause and for default are synonymous).

the defects in the product "are minor in nature and extent." *Id.* at 232, 366 F.2d 1003. The doctrine cannot apply when "extensive repair or readjustment is necessary in order to produce a fully operable product," and requires consideration of "the urgency of the Government's demand." *Id.*

All contracts impose upon their parties an implied duty of good faith and fair dealing. *See Essex Electro Eng'rs, Inc. v. Danzig,* 224 F.3d 1283, 1291 (Fed.Cir.2000); *Tecom,* 66 Fed.Cl. at 769–70; Restatement (Second) of Contracts § 205 (1981). Under this overarching duty are two related, implied duties: the affirmative duty to cooperate, and the negative obligation not to hinder or delay performance. *Tecom,* 66 Fed.Cl. at 769–70; *see also C. Sanchez & Son,* 6 F.3d at 1542; *SIPCO,* 41 Fed.Cl. at 217. Both aspects of the implied duty of good faith and fair dealing are assessed under a reasonableness standard, under the particular circumstances of each contract. *Tecom,* 66 Fed.Cl. at 770; *see Commerce Int'l Co. v. United States,* 167 Ct.Cl. 529, 536, 338 F.2d 81 (1964) (describing breach of the duty to cooperate); *C. Sanchez & Son,* 6 F.3d at 1542 (finding no violation of duty not to hinder performance).

A presumption of good faith conduct of government officials applies when these officials act under a duty to employ discretion, granted formally by law, regulation, or contract. *Tecom,* 66 Fed.Cl. at 769. When a government official is accused of fraud or quasi-criminal wrongdoing, there is a strong presumption of good faith that a plaintiff can rebut only by clear and convincing evidence. *Id.; see Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234, 1239–40 (Fed.Cir.2002). When the lack of good faith that is alleged does not sink to the level of fraud or quasi-criminal wrongdoing, clear and convincing evidence is not needed to rebut the presumption, and proving "a lack of substantial evidence, gross error, or the like" will do. *Tecom,* 66 Fed.Cl. at 769. But when the government actions that are alleged are not formal, discretionary decisions, but instead the actions that might be taken by any party to a contract, the presumption of good faith has no application. *Id.; see Moore v. United States,* 46 Ct.Cl.

139, 172–74 (1910). Thus, the presumption of good faith conduct usually has no relevance to a claim that the implied covenant of good faith and fair dealing has been breached. *Tecom,* 66 Fed.Cl. at 771.

### 4. Subject Matter Jurisdiction and Contracting Officers' Authority

The issue of a lack of subject matter jurisdiction may be raised by the parties to a dispute, or by the Court, at any time in the proceedings. *Folden v. United States,* 379 F.3d 1344, 1354 (Fed.Cir.2004). In evaluating a motion to dismiss for lack of subject matter jurisdiction, the Court must presume the truth of all undisputed factual allegations and construe all reasonable inferences in favor of the non-movant. *Pixton v. B & B Plastics, Inc.,* 291 F.3d 1324, 1326 (Fed.Cir.2002); *Forest Glen Properties, LLC v. United States,* 79 Fed.Cl. 669, 676 (2007). But where a movant challenges specific jurisdictional facts, the Court may consider all relevant evidence, including matters the pleadings did not raise, and make any factual findings pertinent to resolving the issue of jurisdiction. *Moyer v. United States,* 190 F.3d 1314, 1318 (Fed.Cir.1999); *Forest Glen,* 79 Fed.Cl. at 676.

A final decision by a contracting officer is a jurisdictional prerequisite to the litigation of claims under the CDA. 41 U.S.C. § 605(a); 28 U.S.C. § 1491(a)(2) (providing that our Court "shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor ... on which a decision of the contracting officer has been issued"). This prerequisite applies to the claims of both contractors and the government. *Sharman Co., Inc. v. United States,* 2 F.3d 1564, 1568–69 (Fed.Cir., 1993), *overruled on other grounds by Reflectone, Inc. v. Dalton,* 60 F.3d 1572 (Fed.Cir.1995). For purposes of the final decision requirement, a claim that is not acted upon within sixty days is deemed denied by the CO. 41 U.S.C. § 605(c)(5); *see Pathman Constr. Co. v. United States,* 817 F.2d 1573, 1575 (Fed. Cir.1987). If a claim is already pending in litigation, a contracting officer has no authority to issue a final decision on the claim, as exclusive governmental authority rests with

the Department of Justice. *Sharman*, 2. F.3d at 1571–72. When a CO lacks authority to decide a claim, any decision that is issued is invalid and cannot be the basis of a CDA claim, and the failure to act will not result in a claim being deemed denied. *Case, Inc. v. United States*, 88 F.3d 1004, 1009 (Fed.Cir. 1996).

## B. Jurisdiction over the Counterclaim

■ Universal argues for the dismissal of the government's counterclaim for reprocurement and incidental costs, contending that the "substance" of the counterclaim was pending in this Court once the initial complaint was filed; thus, under *Sharman*, the CO would have lacked the authority to issue a final decision demanding these costs. *See* Pl.'s Br. at 7–9 (citing, *inter alia*, *Sharman*, 2 F.3d at 1571–72). The government opposes, arguing that the counterclaim is not a "mirror image" of the claims in the original complaint, *see* Def.'s Resp. at 6–9 (citing, *inter alia*, *Case*, 88 F.3d at 1010), because "[t]here is no factual or legal overlap between Universal's appeal of the Navy's decision to terminate for cause and the Navy's claim for reprocurement and incidental costs." *Id.* at 6.

The question of whether the CO had authority to issue the demand that is the basis for the government's counterclaim must be analyzed in light of the prior proceedings in this case. Plaintiff's initial complaint was filed within a week after Universal submitted its claim to the CO seeking the conversion of the termination for cause into one for convenience, and requesting the award of $233,000 in termination for convenience costs. *See* Compl. (Dec. 4, 2000); JX 11 at 1 (certified claim, dated Nov. 30, 2000), 13 (receipt indicating Dec. 1, 2000 delivery). While the two documents contain nearly identical factual allegations and legal arguments, the two differ in the relief sought. In our Court, Universal did not request an award of termination for convenience damages. Instead, based on each of its four asserted reasons why the termination for convenience was allegedly improper, Universal sought merely a "judgment against the Navy ... converting the termination for default to a termination

for convenience and a declaration that Universal Shelters is entitled to appropriate monetary relief." Compl. at 11–14. The conversion, and the consequences of it, are the automatic result of a finding that termination for cause was improper, per a FAR clause included in Universal's contract. *See* 48 C.F.R. § 52.212–4(*l*)–(m) (2000); JX 2 at 5.

The CO never issued a decision on the certified claim, but nearly five months later issued her final decision demanding the reprocurement and incidental costs. DX 97. Within five months of receiving the latter, Universal filed its amended complaint requesting the termination for convenience costs on the theory that its claim was deemed denied through CO inaction, and challenging the reprocurement and incidental costs demand. Am. Compl. ¶¶ 46–48, 54, 60, 66, 72, 73. The government's answer included its counterclaim. Def.'s Answer to Am. Compl. & Def.'s Countercl. ¶¶ 75–80.

Two years and four months after the amended complaint was filed, and less than three weeks before the trial was initially scheduled to begin, the government moved to dismiss Universal's claims for termination for convenience damages. *See* Def.'s Mot. to Dismiss. The government argued that the Court lacked jurisdiction over this portion of plaintiff's case, because the CO "was divested of authority to rule upon that claim when Universal filed its complaint in this Court alleging the identical theory of recovery." *Id.* at 2. Defendant took the position that because the "claim for convenience" was "the subject of litigation in this court," the CO no longer had "the authority to resolve that claim" under the *Sharman* opinion and 28 U.S.C. §§ 516–20. *Id.* at 8. The government noted that the certified claim and the initial complaint "recite identical operative facts" and "are mirror images." *Id.* In opposition to plaintiff's motion to dismiss the counterclaim, the government contends there is "no factual or legal overlap between" the initial complaint and the counterclaim. Def.'s Resp. at 6. The government explains that the latter raises "cost issues that depend upon none of the same operative facts as Universal's appeal of the termination for cause,

except only that both arise under the same contract." *Id.* at 8. And defendant adds that "the complaint and the counterclaim do not seek the same monetary relief." *Id.* at 9.

Under the circumstances presented, the Court finds that it cannot distinguish between the CO's authority to rule upon the request for termination for convenience costs, and her authority to issue the demand for the payment of reprocurement and incidental costs. The government overlooks the fact that the initial complaint did not seek *any* monetary relief. Thus, if the question of a CO's authority turns on the *relief* that is sought in our Court, she would not have been deprived of the authority to rule upon Universal's request for termination for convenience costs. If, on the other hand, what is relevant is the *theory* of recovery—Universal's claim that it is entitled to termination for convenience costs because the termination for cause was improper—the validity of that theory will also decide whether the government may recover any reprocurement and incidental costs. If the CO lost authority to decide Universal's claim for termination for convenience costs because the issue of the validity of the termination for cause is in the hands of the Department of Justice, the Court cannot see how she could have authority to issue the demand for the costs allegedly resulting from the termination for cause. Each side's money claim is the monetary consequence of the termination for cause, to which they are "inextricably linked." *Malone v. United States,* 849 F.2d 1441, 1445 (Fed.Cir.1988); *Crippen & Graen Corp. v. United States,* 18 Cl.Ct. 237, 241 (1989).

█ The termination for convenience costs claim and the counterclaim cannot be distinguished on the ground that only the latter turns on facts unrelated to what must be decided in the challenge to the termination for cause. The quantum of plaintiff's claim likewise is not determined by the propriety of the termination for cause decision. Without question, a final decision to terminate a contract for cause may be challenged by a contractor in our Court without any

accompanying demand for the payment of money. *See Sharman,* 2 F.3d at 1572. If, merely because a successful challenge results in a conversion of the termination into one for convenience, *see* 48 C.F.R. § 52.212–4(m), the pendency of such a claim—as contained in the initial complaint—removes from the CO the authority to decide whether the contractor should be paid termination for convenience costs, the authority to decide if the contractor must pay reprocurement costs would logically also be removed.

This is not to say that the Court agrees that the pendency of the initial complaint removed the authority over either decision from the CO. Indeed, in at least one case, the Federal Circuit has held that our Court had jurisdiction over a claim for convenience costs that a CO failed to rule upon while a complaint containing a challenge to the termination for default was pending in our Court. *See Daff v. United States,* 78 F.3d 1566, 1570, 1573 (Fed.Cir.1996).[9] The best reading of *Sharman* and *Case* would seem to be that the authority of a CO is lost regarding claims for a particular sum of money that is in litigation. *See Case,* 88 F.3d at 1010 (explaining that *Sharman* applied when two claims "involved precisely 'the same money' ") (quoting *Sharman,* 2 F.3d at 1571). Here, the initial complaint involved no money of any sort. But the government has urged upon the Court, and obtained plaintiff's acquiescence to, an interpretation of *Sharman* that deprives a CO of the authority to decide the monetary consequences of a claim to convert a termination for cause into one for convenience, when the contractor has filed a complaint which challenged the termination but sought no award of money.

█ As the Supreme Court has explained, the rule of judicial estoppel " 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.' " *New Hampshire v. Maine,* 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (quoting *Pegram v. Herdrich,* 530 U.S. 211, 227 n. 8, 120 S.Ct. 2143,

---

9. The default clause of the contract at issue in that case similarly contained a provision that if the default were to be subsequently reversed, the parties would have the same rights as if the termination were for convenience. *See* 48 C.F.R. § 52.249–8(g).

147 L.Ed.2d 164 (2000)); *see also Transclean Corp. v. Jiffy Lube Int'l, Inc.*, 474 F.3d 1298, 1307 (Fed.Cir.2007). Our Court has held that the rule of judicial estoppel applies to the United States. *Cuyahoga Metro. Hous. Auth. v. United States*, 65 Fed.Cl. 534, 554–57 (2005). Some of the factors to be considered in applying the doctrine include whether "a party's later position" is "clearly inconsistent with its earlier position," *New Hampshire*, 532 U.S. at 750, 121 S.Ct. 1808 (internal quotation marks and citations omitted); "whether the party has succeeded in persuading a court to accept that party's earlier position," *id.;* and "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 751, 121 S.Ct. 1808 (citing, *inter alia, Davis v. Wakelee*, 156 U.S. 680, 689, 15 S.Ct. 555, 39 L.Ed. 578 (1895); *Philadelphia, W., & B.R. Co. v. Howard*, 55 U.S. (13 How.) 307, 335–37 (1852)). The Court concludes that application of the rule is warranted in these circumstances, as the government's current position in clearly inconsistent with the position it advanced earlier to secure the dismissal of Universal's money claims. If a claim for convenience costs is beyond the authority of a CO once the question of the propriety of termination for cause is put into litigation, then the demand for reprocurement and incidental costs must also be beyond her authority. Neither money request may be determined without knowing if the termination for cause were proper, and if the government benefits from the former it must accept the latter. Universal's motion to dismiss the counterclaim is GRANTED.

## C. Findings of Fact and Conclusions of Law

### 1. The Navy Procures Containment Structures

The Navy's ship recycling program, conducted at PSNS, involves cutting apart the hull and removing the equipment from ships that have been decommissioned. Tr. at 101–03. The reactor components of nuclear vessels are removed and then shipped by barge to Hanford, Washington. Tr. at 102. Conditions of the Columbia River provide only two windows of opportunity for these barge trips, one in the spring and another in the fall of each year. Tr. at 47, 51, 102, 165. The method the Navy had previously employed to protect from the elements the workers dismantling vessels, and to contain the resulting debris, was to build a scaffolding on the deck around each work area, place a sub-roof on top, and shrink-wrap the structure. Tr. at 65, 104, 165. The Navy found it cumbersome, labor-intensive, and time-consuming to have to remove the sub-roof by crane, place it on the pier, lower into the workspace equipment and materials, and then replace the sub-roof. Tr. at 104–05.

In early 1999, the Navy began to consider an alternative approach using telescoping containments, tent-like structures that could roll on tracks, retract into a space clear of the work area, extend to cover the work area, and be moved by hand. *See* Tr. at 103–05. At that time, plaintiff had some seven years' experience designing and constructing temporary shelters, which were used in oil and gas refineries' cleaning operations, the painting of ships, and defense projects including the re-decking of Coast Guard cutters, the construction of Seawolf submarines, and the painting and reconditioning of F–14 Tomcats. Tr. at 356–60. One of plaintiff's distributors was contacted for information by the Navy in late-spring 1999, and Mister Fudge, plaintiff's president, was put in touch with Mr. Avery of PSNS, the technician working on the containments project. Tr. at 360–61.

Over the next two months they had discussions concerning containment design, and in late July 1999, Mr. Avery called Mr. Fudge to inform him that procurement of the structures was imminent and to ask for a preliminary cost estimate. Tr. at 361. This estimate required knowledge of how much steel would be needed in the framework, which in turn was based on the wind loading that the structure was required to withstand. Mister Fudge remembers Mr. Avery telling him that wind speeds were "somewhere between 60 and 80 miles per hour" but that "the weather could be brutal." Tr. at 361–62. The structure plaintiff had built for the Seawolf submarine project was a seven-story-tall tele-

scoping unit, which was designed for 100 mile per hour winds without any special exposure requirements. Tr. at 359–60. Universal's president asked Mr. Avery if he should estimate the PSNS containments based on 100 mile per hour winds, and believed that Mr. Avery concurred. Tr. at 361. On that basis, when the solicitation from PSNS for the purchase of its first two telescoping containments was issued in August 1999, Mr. Fudge calculated his bid. Tr. at 362. The contract was awarded to low bidder Big Top Manufacturing ("Big Top"), Tr. at 95, 362, a competitor with which Mr. Fudge had some apparent history.[10]

In mid-January, 2000, Mr. Fudge learned from Mr. Avery that the Navy was looking to purchase four more rolling, telescoping containment units. Tr. at 362. Universal's president asked if he could fly out and see the Big Top structures, to copy the design, and was told the area was sensitive. Tr. at 363. The solicitation, issued on January 13, 2000, JX 1 at 1, was of an urgent nature due to the need to meet a recycling schedule based on the availability of the Columbia River for barge shipments. See Tr. at 36, 47, 51; see JX 1 at 22 (listing an "[u]rgent delivery evaluation factor"). The manufactured but unassembled containment units were to be delivered on or by February 29, 2000. JX 1 at 5. The solicitation provided that shipyard personnel were to assemble and install the four structures, with the aid of an "on-site technical representative" of the contractor who was "to provide guidance or to resolve problems for the duration of the containment assembly and installation phases." JX 1 at 30 (¶ 3.4.2.1.1); see id. at 23 (¶ 1.2.2.1), 24 (¶ 3.1.2.2), 30 (¶ 3.4.2.1.2). The assistance of the technical representative was to be performed by March 10, 2000. JX 1 at

5. The solicitation required the contractor to submit shop drawings, full instructions for assembly and disassembly, engineering calculations, and the rigging procedure for lifting by crane, "within 10 working days after date of award," a requirement that was emphasized with bold lettering and underlining. Id. at 30 (¶ 3.5). The specifications were written by Mr. Avery, borrowing from an earlier specification written by Mr. Peterson, a PSNS structural engineer who worked on the ship dismantling projects. Tr. at 106–07, 200–01. Mister Avery was identified as the Navy's technical POC. JX 1 at 4.

Although Mr. Fudge read the specifications before putting together and submitting Universal's bid, he failed to appreciate the significance of the "Exposure D" wind loading requirement. Tr. at 364–65, 417–18. He reviewed the specifications in order to confirm that the solicitation sought the same type of structures that PSNS bought the year before. Tr. at 417. Accordingly, he doubled Universal's prior bid because this time four, not two, containments were being purchased, and then applied a discount. Tr. at 364. The contract was awarded to Universal on January 24, 2000.[11] JX 2 at 1. The contract specifications required that the structure's design and the engineering calculations showing that the design meets specifications were to be " 'sealed' by a registered professional engineer." JX 2 at 17 (¶ 3.2.5.1.4), 19 (¶ 3.5.4). Thus, Mr. Fudge contacted his friend Mr. Morrison of Architecture North, who had performed calculations and design work for him in the past. Tr. at 364.[12] After Mr. Morrison reviewed the specifications, he called Mr. Fudge and explained that the Exposure D wind loading requirement, to withstand 83 mile per hour

10. Prior to starting Universal, Mr. Fudge had more than ten years' experience manufacturing shelters. See Tr. at 355–56. A prior business had evolved from manufacturing trampolines to also making shelters, and was sold to a group of investors who ultimately defaulted on their loan. Id. Mister Fudge and a partner foreclosed and took back the business, while the investor group took over one of the company's distributors and formed Big Top. Id.

11. Although the matter was not raised at trial, from prior filings with the Court it appears that

the only other offeror, Big Top, would not have attempted to meet the February 29 deadline. See App. to Def.'s Mot. for Summ. J. at 48.

12. Mister Morrison has an architectural engineering degree and certificates in structural engineering, but is a registered architect, not a registered engineer. DX 103 at 4; see also Tr. at 210. Universal did not have either the design or the engineering calculations sealed by a registered professional engineer. Tr. at 416–17.

winds, was much more severe than the normal exposure for which Universal designed products in the past. Tr. at 364–65.

### 2. Design and Construction of the Structures

Never having designed a structure to withstand this amount of wind force before, and facing a delivery date that was just five weeks away, Universal embarked on a process of constant revision of the containments' design right up until the date the materials were being shipped from Georgia to Washington state. See Tr. at 365–69, 398–401. Each of the three sections of a containment unit had five steel arches, or ribs, which were connected by lateral pieces. See Tr. at 400–01; JX 4 at 4–6. To try to meet the Exposure D requirement, Mr. Morrison would run a computer program to identify areas in the arches needing more steel; extra steel would be added to the design, and then Mr. Morrison would run more calculations to see what locations were stressed as a result, in turn needing more steel. Tr. at 367. The result was a design that started out with single truss tubes ending up with four tubes that themselves would have additional tubes inside them. Id.; see also Tr. at 142 (describing and identifying a portion of the structure with "six individual tubes all coming together at one spot"); DX 38–16.

Because of the extra steel, the contract cost much more to perform than Universal had anticipated. Tr. at 368. Mister Fudge admitted that "we didn't know what all we had to do" as Universal worked on the design, id., and that "there was no way" it could build the four containments in the time required unless it "started immediately upon bid notification," basing design decisions on his discussions the previous year with Mr. Avery rather than upon the specifications. DX 20 at 2. In addition to the Exposure D requirement, other details in the specifications were overlooked by Universal. It failed to notice the maximum enclosure height of 40' 6" as measured from the main deck, provided in Enclosure 3, see JX 2 at 23, and instead proposed a structure that was 42' 1" tall. JX 4 at 4. After the Navy pointed out this error, see DX 10 at 2, Universal

attempted to shift the blame to the Navy. See DX 20 at 2; Tr. at 370–71. Universal also planned to use a type of steel tubing that was not "hot-dip galvanized" as required by the specifications. See JX 2 at 17 (¶ 3.2.6.2); JX 4 at 3; DX 10 at 3; DX 20 at 2–10. The contract was modified to allow the substitution. JX 5 at 1–2. And Universal never obtained the seal of a registered professional engineer to verify its design or engineering calculations. Tr. at 416–17.

As the design of the structure was a work in progress, the shop drawings and assembly instructions that were submitted February 7, 2000—ten working days after contract award, see JX 2 at 19 (¶ 3.5)—would not reflect the final design. See JX 4; Tr. at 401. Contrary to the specifications, see JX 2 at 19 (¶ 3.5.4), Universal did not submit engineering calculations at that time, but instead sent a set of calculations nine days later at the prodding of PSNS. Tr. at 367–68; JX 3. Mister Fudge testified that he was told by Mr. Avery not to "worry about the calculations," because the Navy was "not going to check behind you." Tr. at 368. But while the CO's response to the February 7 submission stated it was "not the Shipyard's intent to analyze these calculations and approve them," she added that PSNS wanted "to have them for reference," which would not be the case if the Navy were indifferent to their accuracy. DX 10 at 2. Mister Avery had testified prior to Mr. Fudge and was not asked by plaintiff's counsel about any such conversations concerning the engineering calculations. In these circumstances, the Court does not find that the contractor was ever relieved of its contractual responsibility to provide engineering calculations documenting that the specifications were met by the design of its structure. See JX 2 at 19 (¶ 3.5.4).

Because the design of the structure was a work in progress, the materials were shipped in a somewhat random and haphazard manner, as truck loads might have different portions of the framework of each of the three sections making up a containment, rather than the parts for one entire section. Tr. at 401–02. Parts were shipped once the engineering was completed for them, even though other parts of the same section were still

being re-designed. *Id.* As a consequence, the Navy was vexed by the lack of an inventory list showing which parts had arrived, and by the absence of updated, detailed assembly instructions. Tr. at 24–25; DX 27. These difficulties were compounded by the lack of a clear guide to the color-coding scheme used on the parts. Tr. at 116–17; DX 27 at 3. The contract modification extended the delivery date of the structures to March 8, 2000, *see* JX 5 at 2, but shipments arrived between March 13 and March 27. *See* DX 25; DX 27 at 2; Tr. at 372. Some of the delays were due to such problems as one truck crashing, another breaking down, and a driver needing emergency medical attention. DX 24; DX 25; Tr. at 371–72. The Navy was still willing to accept the material, once an inventory list was provided allowing it to determine it had received the parts for four full containments. *See* DX 27 at 1.

Mister Fudge arrived at PSNS to serve as technical representative while the shipments were still en route. *See* Tr. at 372; DX 24 at 1. He directed the shipyard personnel to assemble one of the middle, 50–foot wide sections first, "because those parts were more available in the piles that [were] laying out and around." Tr. at 423. During the seven days Mr. Fudge was present, the walls of the section were assembled, and work on its ribs had begun. Tr. at 373–74. He complained that the shipyard provided a full crew of five workers only three of the days he was there, and that Mr. Avery was only there the first day. Tr. at 373–75. Mister Fudge thought the Navy hardly seemed to be urgent about the project, *see id.*, although he seems not to have taken into account whether the problems with fielding a crew were caused by the delivery schedule not being met. One aspect of the operation that made assembly difficult for the work crews was the color-coding of parts. Tr. at 116–17. Some parts had been painted at the ends to signify that they were specific to a location in a particular section, and the ones without

paint were interchangeable. Tr. at 374; *see* DX 26–13. While Mr. Fudge served as the on-site representative, he told the laborers which parts to take and how to assemble the section, but never explained the color-coding of parts. Tr. at 374–75. The Court notes that the original assembly instructions, submitted February 7, identified only blue paint and green paint used in color-coding. *See* JX 4 at 18. The revised instructions, sent in response to the cure notice, describe five colors: purple, blue, green, black, and rose. *See* JX 9 at 3–4, 6–8.

Mister Wester arrived with the last shipment of parts on March 27, and replaced Mr. Fudge as Universal's on-site representative. *See* Tr. at 187–88, 372. On March 30, 2000, the CO issued the letter detailing purported "deficiencies" that the government considered "to be endangering performance." DX 27 at 3. The Navy requested an "accurate and complete material/parts list" which identified the color coding, and a "more detailed assembly instruction." *Id.* The CO stressed that the government did "not have an accurate inventory of the individual pieces required to assemble any given section," and did "not posses[s] sufficient documentation to assemble [the structures] on [its] own." *Id.* at 2. Absent this information, the Navy was forced to rely on Universal's on-site representative, and thus the CO requested that the representative remain present until one of each sized section were erected. *Id.* at 3. A plan to correct the "deficiencies" was requested by the afternoon of April 3, 2000. *Id.*[13] The record does not reflect whether any such plan was submitted, but Universal informed the Navy in an April 7, 2000 e-mail that it was "in the process of rewriting the assembly and disassembly instructions, along with the rigging and relocation instructions." JX 7. Responding to a request for "a few clarifications on portions of the engineering calculations submitted for the shelters," DX 28, this e-mail also authorized Mr. Peterson

---

13. Among the "deficiencies" noted in this letter was the following: "After inspecting the 50' assembled roof, we found that the tarp is inadequate to hold the slip joints together. The slip joints will not stay closed." DX 27 at 2. When testifying about this letter, the CO skipped over this portion, *see* Tr. at 24–26, and thus the record does not show if this concern were resolved. If the Navy placed the 50' section on the deck of the former CGN 39 without first resolving the slip joints problem, this would directly bear on the government's ability to collect incidental costs incurred as a consequence.

to directly contact Mr. Morrison, and provided the latter's phone number. JX 7.

The previous day, the assembled 50–foot wide section of a containment was placed on the deck of the former USS Texas. *See* Tr. at 122–24, 194, 378, 384; DX 33–13; DX 33–16. Eight days later, it was found tilting to one side, with its frame bowed and some slip joints having come apart. Tr. at 125–29, 137–39; DX 37; DX 38–2; DX 38–8; DX 38–16; DX 45–8. An assembled 53–foot wide section, which was sitting on the pier prior to being installed on the ship, had most of its fabric end panel blown off, and also had slip joints that had come apart. Tr. at 131–34; DX 43; DX 41–3; DX 41–7; DX 41–19. The Navy considered the inability of these two sections to keep their shape in the face of 18 to 20 mile per hour winds to be a failure, in light of the specification requiring the containment to withstand Exposure D winds of 83 miles per hour. *See* DX 37; DX 43. Mister Wester, who was able to view the 50–foot wide section from the pier at a distance of about 50 to 75 yards, Tr. at 188–89, called Mr. Fudge on April 14, the day the damage was discovered, and informed him of it. Tr. at 379. Mister Fudge received no word directly from the Navy until the following Wednesday, when he was told a cure notice was forthcoming. Tr. at 379–80.

### 3. The Cure Notice, Response, and Termination

The CO issued the cure notice on April 21, 2000. JX 8. The cure notice stated that the failure of the Universal containment to meet the Exposure D specification was "a condition that is a failure to perform in accordance with the specifications of the contract." *Id.* at 1. Universal was told that "unless this condition is cured within 10 days after receipt of this notice, the Government may terminate for cause." *Id.* at 3. The CO described the "failures" as the damage to the two sections by "nominal wind speeds." *Id.* at 1. The 50–foot wide section on the ship's deck "appear[ed] to have been blown over to the east to the point that a number of the 'slip joints' of the upper 'bow' trusses worked away from the mating with the other truss section." *Id.* As a consequence its "truss

bowed and the entire section slid over on" the rail to which it was attached. *Id.* The Navy noted that "[s]everal of the lower joints have moved to the point they are practically pulled apart," and that "there is evidence showing several pipes at the intersection of the trusses and the 'H' frames buckled." JX 8 at 1. The 53–foot wide section on the pier "appear[ed] to have much of the same type of damage." *Id.* Wind "tore the end panel half off," tearing out about "half the brass grommets" which affixed the panel to the frame, and moved "the enclosure around to the point that it is now 'racked.'" *Id.*

The cure notice recited the design requirements from the specifications, and again noted that "the wind speed that resulted in the failure was nowhere near that which the contract specifications required the containment to withstand." *Id.* at 2. Among the design requirements that were quoted were that "[e]ach containment shall be designed and constructed to withstand loading in accordance with the [UBC] for the Bremerton, Washington region," which was specified as "'Exposure D', 83 mph," JX 8 at 2 (quoting specification ¶ 3.2.5.1); that "[t]he containment and associated foundation shall be designed to meet UBC 'Exposure D,'" *id.* (quoting specification ¶ 3.2.5.1.2); and that "[f]ull wind load shall be assumed to be applied to the containment when stationary." *Id.* (quoting specification ¶ 3.2.5.1.3). The cure notice also stated that Universal had not yet sent a complete material and parts list which identifies the color coding scheme, and more detailed assembly instructions. *Id.* The government informed the contractor: "We require you to demonstrate that you can provide the Containments in accordance with the specification requirements of the contract." *Id.* at 3.

Universal was puzzled by the cure notice. Mister Fudge's immediate response, that same day, informed the Navy that he did "not understand the proposed failure" and was "waiting to receive the pictures to help us understand what happened." JX 8 at 4. Universal stated it was "taking the necessary steps to solve the situation" and had notified its "Engineer," Mr. Morrison, who was "reviewing all engineering." *Id.* Mister Fudge

closed by pledging that "as soon as we have researched an engineered and sound situation, we will make recommendations to allow us to solve this situation." *Id.* Universal viewed the cure notice's recitation of the design requirements from the specifications as something of a non sequitur, as it viewed them as applying to a *fully-assembled containment unit,* and not to individual sections that were sitting in isolation during assembly. *See* Tr. at 384–85, 397–98, 407–08, 412. Since the "failures" that were identified in the cure notice were the effects of wind on isolated, individual sections, *see* JX 8 at 1, Universal thought the Navy wanted solutions to that particular problem of the Navy's, rather than seeking assurances that the containments were designed to meet Exposure D. Tr. at 397–98, 407–08.

Thus, Universal's response to the cure notice began by explaining that its structure "was engineered and designed to work as a closed structure" rather than as three separate, individual sections. JX 9 at 1. The contractor viewed the damage described in the cure notice as resulting from the Navy's failure to take proper precautions during construction. *See id.* Universal had not thought to instruct the Navy to take such precautions, because it was unprecedented for a customer not to protect from the weather every phase of the building process, and to leave "any part of the shelter ... to stand alone for a week at the time waiting on someone to complete the next section." *Id.* Universal noted that the attached assembly and disassembly instructions contained the recommendations of Messrs. Fudge and Morrison, *id.*, and asked that the Navy review a letter from Mr. Morrison detailing his "recommendations and conclusion." *Id.* at 2. Two of his four recommendations involved welding, as Mr. Morrison stated that the arches' " 'slip joints' must be fully welded" for them to withstand "bending forces," JX 9 at 10, and that "reinforcing tubes" be welded to the upper slip joint members "spanning from spacer to spacer." *Id.* at 11. The revised assembly instructions appear to incorporate at least the first of these. *See id.* at 7 (instructing "when all arches are in place, weld all joints all the way around").

The other two recommendations were temporary measures. Mister Morrison suggested adding a second set of anchor chains opposite the ones which were attached to the track captivation device. *Id.* at 10. And "[m]ost importantly," because "the structure is designed as a closed structure," Mr. Morrison stated that "[w]hen under construction or open ended, four temporary brace cables should be installed," at his suggested location. *Id.* at 11. A note in the revised assembly instructions stressed that these two recommendations were "to protect the uncompleted shelter from damage," and explained that "[a]ll engineering has taken into account the fact that this shelter operates as a closed shelter and not as (3) separate entities." JX 9 at 8. The cables to "criss-cross the shelter" were to be used when the individual sections were "waiting for the other (2) shelters to join them." *Id.* The anchor chains and cables were among the "precautions [which] should be taken to secure the individual shelters until such time as" all three individual sections are joined together for operation. *Id.*

At the CO's request, Mr. Avery and other PSNS personnel working on the ship recycling project reviewed the response to the cure notice and reported back to her. Tr. at 34, 140–41, 153, 156. The recommendation to weld the slip joints was viewed as impractical, given the time it would take to remove the grease from the pipes that were already joined, remove the galvanizing from all of the joint areas, piece together and weld all of the sections. Tr. at 35–36, 141–43, 156. The resulting structures would also not be easily disassembled for future use. *Id.* at 143. The Navy also recognized potential environmental problems associated with removing zinc from the piping in proximity to water. Tr. at 36, 154–55. Because Mr. Morrison's letter stated that the diagonal brace cables were needed when a shelter was "under construction *or open ended,*" JX 9 at 11 (emphasis added), the Navy interpreted this to apply whenever the flap on an end panel wall was open. Tr. at 40–41, 148–50; *see* DX 51 at 1. Placing the cross-cables where Mr. Morrison recommended, while the assembled containment was in use, would violate the specification requiring a 17 foot high "clear space

envelope," JX 2 at 12 (¶ 1.1.1), and prevent the sections from rolling past the jib cranes fixed to the deck. Tr. at 38–39, 148–49, 223–24; see DX 51 at 2–6. And doubling the number of anchor chains was viewed as irrelevant to the failures identified in the cure notice—as the chains were designed merely to prevent the units from rolling along the tracks, and were attached at too low of a point to add support to the frame. Tr. at 144–47, 219–21.

Around this time, Mr. Peterson "was asked to perform an independent engineering review of [Universal's] structures." Tr. at 206. He reviewed the engineering calculations submitted by the contractor, and determined that Mr. Morrison "had the correct load assumptions for wind speed, wind exposure, [and] snow load." Tr. at 207. But he discovered that no calculation was submitted relating to the middle section of the containments, the 50–foot wide one that was most dramatically affected by the wind. Tr. at 207–08. The only calculations were based on the largest of the three sections, which was stiffer than the middle one due to the framework of the upper end wall. Tr. at 208, 225–26. Mister Peterson "proceeded to model and analyze the middle shelter," based on the drawings submitted by Universal and the wind loading information supplied by Mr. Morrison. Tr. at 208–09; see DX 49. His results, generated May 2, 2000, showed that under Exposure D, 83 mile per hour winds, the bending stress on two sections of one of the arches exceeded the allowable stress limit. Tr. at 211–14; DX 49 at 7. Thus, he concluded that the UBC provision incorporated into the specifications was violated by the middle section's design. Tr. at 211–12, 214. He also determined that, under the Exposure D conditions, there would be a "severe deflection" of the middle section, as it would shift by 65 inches and contact the largest section which overlapped it—while the latter would only move by 18 inches. Tr. at 215–16; see DX 49 at 6. In his model he assumed, just as if the shelter were closed at the ends, that wind did not enter the shelter, but instead directly hit the side walls. Tr. at 239; see also DX 50.

On May 2, 2000, Mr. Peterson wrote up a summary of findings for Mr. Avery. He wrote that Universal's "containment design does not adequately meet the objectives specified in the contract requirements," explaining: "Deflections of the structures are excessive under maximum design wind load, which at best would result in undesired contact between shelters, and at wors[t] compromise the overall integrity of the structure." DX 50. As Mr. Peterson's analysis assumed that the slip joints would stay closed, the welding proposal in the cure response would not have made the structure UBC Exposure D compliant. Tr. at 218–19; see also DX 50. After reviewing the response to the cure notice, Mr. Peterson advised the team evaluating the response that the diagonal brace cables proposed by Universal "would only fix the deficiencies of the structure if they were there 100 percent of the time." Tr. at 221–23.

The CO decided that Universal's response to the cure notice proposed changes that were "unworkable," that failed to meet the contract specifications, and revised the structure's design, and she concluded that termination for cause was warranted. Tr. at 43. Following her department's procedures, Ms. Pastorella presented her termination for cause determination to a contract review board. Tr. at 43–45. She finalized her report to the board on May 17, 2000, see Tr. at 46; DX 52 at 2, and made her presentation the following day. DX 52 at 1; Tr. at 46. In the background section of the report, the CO recounted the wind damage suffered by the two assembled sections due to "nominal wind speeds," and noted that the "specifications require[d] the containments to withstand wind speeds of up to 83 MPH." DX 52 at 2–3. She also noted:

> Examination of the contractor's drawing indicates that Universal Shelter's containment design does not adequately meet the specifications of the purchase order. Deflections of the structures are excessive under maximum design wind load, which at best would result in undesired contact between shelters, and at wors[t] compromise the overall integrity of the structure.

Id. at 3.

The CO described the response to the cure notice as "a proposal revising the design of

[the] containments." *Id.* She specifically mentioned the diagonal brace cables, which she wrote were to be "installed in the clear span of each section of the containment when under construction or open-ended," and the doubling of the chain anchors. *Id.* The background section concluded: "PSNS provided a technical review of the contractor's revised proposal. It has been determined that the revised design of the containment will not meet the specifications of the contract." *Id.*

The CO began her "determination" section with an introduction informing the review board that, "[b]ased on the failures cited herein, the containments provided by the contractor do not comply with the specifications of the contract." DX 52 at 3. She added that Universal's response did "not provide the assurance necessary indicating successful future performance." *Id.* Although not required under the FAR when terminating a contract for commercial items, *see* 48 CFR § 12.403(a), the CO considered the FAR factors for termination for default. *See* Tr. 46–53; DX 52 at 4–5; *see also* 48 CFR § 49.402–3(f). The "specific failure" that was recited was "[t]he failure of the two containments sections resulting from wind speeds between 18–20 MPH." DX 52 at 4. The "Exposure D" specification was referenced, *id.* (citing specification ¶ 3.2.5.1.2), and the wind damage was summarized as "deflection/racking problems, truss unmating, frame buckling and end panel tearing." *Id.* The "diagonal brace cables" proposal was said to interfere with the "clear span" for the jib crane, contrary to specification paragraphs 1.1.1 and 3.2.1.3.1, and the CO stated that the proposed second set of anchor chains would prevent the sections from "roll[ing] inside each other," thereby "deviat[ing] from the specifications ... [and] the intended use of the product." *Id.* Universal's proposal was termed a "revision of [its] product design" that was "indicative that the first design was non-compliant with the specifications" and itself failed to comply with the specifications. *Id.; see also* Tr. at 48–49. As another "pertinent" fact to be considered, the CO listed the "potential schedule failure" due to the time it would take to weld the slip joints. DX 52 at 5; Tr. at 53. The CO concluded

that termination for cause was in the best interests of the government. DX 52 at 4, 6.

The proposed termination for cause was approved by the review board. *See* DX 52 at 6; Tr. at 53. The notice of termination for cause was issued May 18, 2000. JX 10 at 1. As was recounted above, the "failure" of the two assembled sections, one installed on the ship deck and the other sitting on the pier, caused by 18 to 20 mile per hour winds was identified as not meeting the "Exposure D" specification of the contract. JX 10 at 1 (citing specification ¶ 3.2.5.1.2). The proposed cross-bracing was described as interfering with the clear space needed for rolling sections to get past the jib crane, and with the ability of the unit to retract. *Id.* Universal was found to have failed to provide a product meeting the specifications, and to provide assurances that these could be met. *Id.* at 2.

### 4. Justifiable Termination or Substantial Compliance?

■ Universal is correct that the specific ground given for the termination for cause was improper. The Navy explains the failure to meet the specifications as resting on the wind damage sustained by individual sections of a yet-unassembled containment unit in winds less than 83 miles per hour. But no provision of the specifications requires that individual sections, sitting open-ended, must meet the Exposure D conditions. Perhaps this item was left out in the haste to draft the specifications for the urgent project, as the specifications have several mistakes. For instance, the specifications were designed for the purchase of just "(2) crane liftable rolling telescoping containments," JX 2 at 12 (¶ 1.1.1), specifically for the CGN 39, *id.* at 14 (¶ 3.2.1.1.2), rather than the four purchased, with two for use on the CGN 38. *See* JX 2 at 4. One provision on the capability of lifting by crane clearly errs by stating that it applies to "[e]ach fully assembled containment," rather than the individual containment sections. *Compare id.* at 18 (¶ 3.3.1.1) *with id.* at 13 (¶ 3.1.2.1) (referring to the "individual fully assembled sections"). And the "Rigging procedure" paragraph is not given a number. *See* JX 2 at 20. But whatever the explana-

tion, there simply is no provision governing the wind speeds that sections must withstand before all three sections of a containment are put together.

The specification is for the purchase of "crane liftable rolling telescoping containments," *id.* at 12 (¶ 1.1.1), and this quite clearly refers to the fully-assembled, three section structure. *See id.* at 21 (Enclosure 1, depicting two "containments" on a CGN vessel, each made up of three sections). "Each containment" is required to have "a maximum length of 54–feet" and must "in part . . . roll completely clear of its length and retract to a collapsed depth of not more than 20 feet." JX 2 at 12 (¶ 1.1.1). Plainly, "containment" refers to the full, three-piece structure. Its three components are called "sections." *See id.* at 13 (¶ 3.1.2.1), 14 (¶ 3.2.1.3.1), 18 (¶ 3.3.2.3), 21–22 (Enclosure 1 & 2). As the specifications explain in detail, when the retracted "sections would be expanded back" there is a "resulting containment [which] shall provide a completely enclosed structure." JX 2 at 14 (¶ 3.2.1.3.1).

Universal's contract does not specify any wind speed that an individual section must withstand, whether during installation or assembly, or if somehow separated from the other two sections. The design requirement on structural capability states that *"[e] ach containment* shall be designed and constructed to withstand loading in accordance with . . . 'Exposure D', 83 mph," and says nothing of individual sections. *See id.* at 16 (¶ 3.2.5.1) (emphasis added). The wind exposure requirement applies UBC "Exposure D" to *"[t]he containment* and associated foundation." *Id.* at 17 (¶ 3.2.5.1.2) (emphasis added). The rolling contingency requirement explains that "[f]ull wind load shall be assumed to be applied to *the containment* when stationary." *Id.* (¶ 3.2.5.1.3) (emphasis added). It is the containment—the union of three sections—which must withstand Exposure D winds of 83 miles per hour.

 The specifications are ambiguous concerning whether this wind exposure must be met when either or both of the flaps of the two end walls are open. On the one hand, the flaps are to open to a minimum height of 17 feet "to allow equipment and material

access," JX 2 at 15 (¶ 3.2.2. 1, Table 1), and there is no reference to reduced wind speeds—so, perhaps, the "[f]ull wind load" that "applie[s] to the containment when stationary" must be borne, *id.* at 17 (¶ 3.2.5.1.3), although it seems unlikely that material and equipment would be brought onto the ship in extreme weather conditions. On the other hand, the primary reason for having the wall openings is "to allow for travel over installed equipment" inside the containments, *id.* at 14 (¶ 3.2.1.3.1), such as the aforementioned jib crane. *See* Tr. at 38, 111. Departing from the 83 mile per hour wind standard, the specification allowed Universal to "provide a recommended reduced wind speed which may be used for periods of containment relocation," JX 2 at 17 (¶ 3.2.5.1.3), which, in this case, ended up being 20 miles per hour at the Navy's prodding. *See* DX 28; JX 7. This might suggest that the Navy was not anticipating having the end walls opened in greater winds than that. Failure to specify the wind loading that applies when end wall flaps are opened is not the sort of glaring gap or omission that would be patent, *see WPC Enterprises,* 163 Ct.Cl. at 6, 323 F.2d 874, and as a latent ambiguity would be construed against the government as drafter. *Interstate General,* 980 F.2d at 1434. Thus, there was no wind loading specification for when an end flap is open, from which one might infer the required capability of an individual section with a fully-opened end.

In any event, when the individual sections are not put together, and thus have either one or, in the case of the middle section, two, fully open ends, there is no "resulting containment" such that the Exposure D requirement for *containments* would have relevance. Interestingly, when the Navy made the reprocurement purchase of two additional containments from Big Top, the specifications for the containments were changed in a number of ways. *See* DX 85. Mister Avery, the author of the specifications, *see* DX 69, denied that they were changed, *see* Tr. at 157, 174, and by this perhaps he meant that the Navy's desired product had not changed. But the specifications used for reprocurement now required "[a]ll structural members shall be connected by positive mechanical

means (i.e.welded, bolted, etc.)," DX 85 at 12 (¶ 3.3.1.2), precluding slip joints such as used in the Universal design. The provision requiring that Exposure D be met was changed to apply to "[t]he containment unit *and containment sections." Id.* (¶ 3.3.1.4) (emphasis added). And, most significantly, the provision allowing a lesser wind loading to be met when relocating was changed to read: "For when containment sections are rolled to a new position *or when the containment units are opened,* the containment *sections* shall be capable of withstanding a *minimum of 20 mph* sustained winds." *Id.* (¶ 3.3.1.5) (emphasis added).[14] This is, at the least, an admission by the government that the 83 mile per hour Exposure D wind requirement had not been intended to apply to sections whenever a section's end was open.[15]

 The government was also unreasonable in interpreting Universal's proposed diagonal brace cables and chain anchors as being designed for use whenever the assembled containments were to be relocated. *See* DX 52 at 4; JX 10 at 1. By doubling the chain anchors, Universal was modifying a feature introduced by the Navy to keep the structure from rolling, and the contractor said nothing to suggest these chains were to be on at all times. *See* JX 9 at 8, 10. And while the architect's note said that the "temporary diagonal brace cables" were to be used "[w]hen under construction *or open ended," id.* at 11 (emphasis added), the assembly instructions that were included in the cure response clearly explained that the brace cables were for use when individual sections were "waiting for the other (2) shelters to join them," and that the precautions were needed until the containment was fully assembled in either the "spread" or "stacked" position. *Id.* at 8. Although "open

ended" could possibly be taken to mean whenever an end flap was open—even when for purposes of relocating the structure—the more specific reference in the instructions sufficiently clarified the "temporary" nature of this feature. It certainly was not clear that "open ended" meant when an end flap was open, as the Navy acknowledged. *See* DX 51 (draft language noting that whether the cable bracing was proposed for when "opening and closing" the containments was "yet to be determined"). And the Navy itself used the term "open end" to refer to the end of a section that did not have an end wall, in contrast to the "partially closed end" with a wall and flap opening. Dx 43 at 1. The diagonal brace cables were not recommended for use when relocating the structures, and the Navy's conclusion that they conflicted with the clear space envelope specifications, *see* DX 52 at 4; JX 10 at 1, is arbitrary.

 The specific reasons supporting the termination for cause, then, rested on a misinterpretation of the contract specifications, and a misreading of the contractor's cure response. This, however, does not end the matter. A termination for default may be sustained on any ground existing at the time of termination, even one not then known to the CO. *See Empire Energy Mgmt. Sys., Inc. v. Roche,* 362 F.3d 1343, 1357 (Fed.Cir. 2004); *Kelso v. Kirk Bros. Mech. Contractors, Inc.,* 16 F.3d 1173, 1175 (Fed.Cir.1994); *Joseph Morton Co. v. United States,* 757 F.2d 1273, 1277 (Fed.Cir.1985); *CJP Contractors, Inc. v. United States,* 45 Fed.Cl. 343, 379 (1999). The government argues that the termination may be sustained on the ground that the design of the entire containment failed to meet the Exposure D specifications, and that Universal did not adequately assure compliance with these specifications. *See*

---

**14.** Other changes included reducing the minimum height of the clear space envelope to 15 feet and the maximum "overall" height to 26 feet, *see* DX 85 at 10 (¶ 3.2.1.1); specifying the term "containment unit" to refer to the assembled structure, *see id.* at 7 (¶ 1); making the contractor responsible for instructions on "securing methods," *id.* at 9 (¶ 3.1.1); and specifically listing as contract line items the submission of documents such as shop drawings, assembly and relocation instructions, and engineering calculations. DX 85 at 3–6 (items 0002–0008).

**15.** As this particular intention was omitted from the specifications of Universal's contract, this is likely a material alteration that would preclude the government from recovering reprocurement costs. *See Seaboard Lumber Co. v. United States,* 48 Fed.Cl. 814, 820 (2001); *Schwartz v. United States,* 106 Ct.Cl. 225, 238, 65 F.Supp. 391 (1946); *United States v. Axman,* 234 U.S. 36, 45, 34 S.Ct. 736, 58 L.Ed. 1198 (1914). As the counterclaim was dismissed for lack of jurisdiction, this issue is not presently before the Court.

Def.'s Br. at 18–22, 25. Of course, among the design requirements reiterated in the cure notice were the specifications relating to Exposure D conditions. *See* JX 8 at 2 (quoting, *inter alia,* specification ¶¶ 3.2.5.1, 3.2.5.1.2, 3.2.5.1.3). As the cure notice required Universal "to demonstrate that [it] can provide the Containments in accordance with the specification requirements," JX 8 at 3, the contractor received proper notice of the government's concerns. *See Empire Energy,* 362 F.3d at 1356.

On this point, the government has proven that Universal had not submitted engineering calculations demonstrating that its containments were designed to withstand 83 mile per hour winds under Exposure D. Mister Peterson's calculations, performed prior to contract termination, showed that the middle section did not meet this requirement. *See* Tr. at 211–16; DX 49 at 6–7; DX 50. This was incorporated in the CO's analysis. *See* DX 52 at 3. Although Mr. Peterson did not factor into his calculations the wind protection provided by the two feet wide portion of the largest shelter when this overlapped the middle one, he convincingly testified that the resulting 15% load reduction would be negligible compared to the severe deflection calculated for the middle shelter. Tr. at 229–30. His calculations were based on the premise that wind hit the middle section on the sides only, as would be the case if the containment were fully assembled. *See* Tr. at 239; DX 50. And his model was based on the design drawings submitted by Universal, Tr. at 209—presumably the final, revised ones submitted in March 2000. *See* Tr. at 420, 431.

The government's expert, Mr. Grover, also persuasively testified that the engineering calculations which Universal submitted to the Navy failed to demonstrate compliance with the wind loading requirement. These calculations, submitted by Universal in mid-February 2000, *see* JX 3; Tr. at 367–68, show

that on several locations of the arches, the stress under Exposure D, 83 mile per hour winds would exceed the allowed stress under the UBC. Tr. at 317–19 (discussing JX 3 at 26, 65). Mister Grover also explained that Mr. Morrison made some errors in employing the UBC equation which determines the wind pressure on a structure. *See* Tr. at 295–304. In calculating the "combined height, exposure and gust factor coefficient," *see* DX 3 at 4 (Table 16–G), Mr. Morrison calculated the height of the structure relative to the adjoining ground rather than the water line, and as a consequence underestimated wind speed by 10 to 20 percent. Tr. at 299–300; DX 102 at 13 (determining that the correct "loading" was "nearly 12% higher than was used in the design of the containments"); *see* JX 3 at 1. In the "pressure coefficient," *see* DX 3 at 5, Mr. Morrison omitted the "upward" force factor, which represents "the uplift . . . on a roof structure." Tr. at 300–02; *see* JX 3 at 1. Thus, the containments were not designed with sufficient tension to withstand the wind's uplift. Tr. at 302.[16] Defendant's expert opined that "[t]he failure to consider vertical uplift in the design calculations probably would have required a reanalysis and redesign, which could have necessitated structural changes to the containments." DX 102 at 21.

Mister Morrison also failed to properly adjust the computer program he used, Win-STRUDL, to take into account that the outside covering of the structures was fabric, and not a solid wall. Tr. at 307–13. Without the proper adjustment, the analysis would have used "plate elements" which wrongly assumed that the fabric could "carry" compressive or bending loads. Tr. at 309–10. The resulting calculation would not accurately determine the stresses on the structure. Tr. at 312. Mister Grover explained that one consequence of this inaccuracy would be the inability to design the structure with sufficient tension in the fabric covering to main-

---

16. Recognizing the "uncertainty" of the matter, Tr. at 303; *see also* DX 102 at 22 (finding no. 6, noting the ambiguity), Mr. Grover testified that if Exposure D were to apply to the containments when the end panels are opened, then Mr. Morrison omitted the "additional value" that is added to the outward pressure coefficient when struc-

tures are partially enclosed. Tr. at 302–04; *see* DX 3 at 5–6 (n.1 to Table 16–H); JX 3 at 1. But, as discussed above, this ambiguity was construed against the government, consistent with the reprocurement specifications—which did not apply the full wind load when containments are opened. *See* DX 85 at 12 (¶ 3.3.1.5).

tain the compressive forces upon the framework, and thus leading to failure of the slip joints. Tr. at 312–13; DX 102 at 14. The type of "permanent deformation" or "yielding" which would result from insufficient fabric tension was evident in the wind damage to the 50–foot section. Tr. at 313–16, 330; DX 38–4; DX 38–6; DX 38–9. Mister Grover also noted that, while the two cure response recommendations to weld together pieces of the containments' frames would strengthen the structure, whether these are sufficient to make the structure meet the specifications' Exposure D requirements cannot be known in the absence of engineering calculations. *See* Tr. at 320–21, 331–32. Universal did not submit calculations with the cure notice response. *See* JX 9. In any event, the containments would not conform to the specifications if the slip joints were welded, as even Mr. Fudge concedes. Tr. at 426.

Mister Grover concluded that the engineering calculations submitted in February 2000 showed that Universal's structure was not designed to withstand 83 mile per hour winds under Exposure D. Tr. at 300, 302, 332, 345, 350. Mister Fudge maintains that these calculations were not intended to show compliance with the specifications, but were instead "preliminary numbers" that did not reflect the structure's final design. Tr. at 365–68. Plaintiff's president testified that these were submitted merely to comply with a "paperwork" requirement, and that Mr. Avery told him to focus on building the structures rather than worrying about the calculations. Tr. at 367–68. Unfortunately, Mr. Avery, who testified earlier, was not asked about this comment. Mister Fudge testified that Universal submitted revised engineering calculations in mid-March 2000, when the revised shop drawings were submitted. Tr. at 419–20. The CO acknowledged receiving a set of drawings at that time, but denied that the Navy ever received any set of engineering calculations other than the ones sent in February 2000. Tr. at 429–31.

The Court concludes the Mr. Fudge's memory must have failed him, as there is no evidence to support his claim that updated, final calculations were submitted to the Navy in mid-March, or ever. To support Mr.

Fudge's testimony, plaintiff attached an exhibit to its post-trial brief which appears to be a set of engineering calculations which were run on April 24, 2000. *See* Ex. 1 to Pl.'s Br. While the Court is convinced that the design of Universal's structure had changed since the engineering calculations were submitted in mid-February, and has no doubt that Mr. Morrison continued to generate numbers to reflect the design changes, the problem plaintiff has is that the existence of these April calculations—even assuming they are identical to calculations performed on the final design of the structure in March—does not prove that calculations were submitted to the Navy in March 2000 or thereafter. Moreover, without the guidance of their author or an expert witness, these calculations are merely columns of numbers to which the Court can attach no particular significance. *See id.* In any event, the government has moved to strike this exhibit, as it comes after the trial was completed and the record of evidence was closed. *See* Mot. to Strike at 1, 3. Plaintiff filed no opposition to this motion, and provided no justification for the submission of additional documentary evidence post-trial. Accordingly, the motion to strike is GRANTED and the exhibit will not be considered a part of the trial record.

 For the foregoing reasons, the Court finds that the government has carried its burden of proving that the termination for cause was justified, based on Universal's failure to document, through engineering calculations, the compliance of its design with the Exposure D specifications. The government is entitled to judgment on Universal's first cause of action, which challenged the termination for cause as improper. For these same reasons, Universal has failed to prove that the design of its containments substantially complied with the contract requirements. Assuming that the second count of the amended complaint—which is not mentioned once in its post-trial brief—was not abandoned by plaintiff, the Court finds that Universal failed to prove that its failure to provide calculations demonstrating compliance with the design requirements was a "minor" and easily corrected defect. *See Radiation Tech.,* 177 Ct.Cl. at 232, 366 F.2d

1003. As was discussed above, the only calculations submitted to the Navy showed that the design of the structures failed to comply with the Exposure D requirements, and compliance with these specifications was necessary for the product to function properly. While it may well be the case that the final design of the structures could indeed withstand 83 mile per hour winds under Exposure D, as Mr. Fudge testified, *see* Tr. at 398–401, 419–21, plaintiff has failed to present sufficient evidence to demonstrate this. Without engineering calculations, explained either by their author or an expert witness, showing that the design met the wind loading requirements or could easily be altered to meet them, the Court cannot conclude that the Universal containments substantially complied with the contract specifications. This is particularly so in light of the government's urgent demand for the product due to the short windows for shipping by barge on the Columbia River. *See* Tr. at 47, 51, 102, 165; *Radiation Tech.*, 177 Ct.Cl. at 232, 366 F.2d 1003.

### 5. *Implied Duty of Good Faith and Fair Dealing*

Universal's final count in its complaint,[17] asserting that the government violated its implied duty of good faith and fair dealing, *see* Am. Compl. ¶¶ 61–66, was also not proven at trial. The difficulties recounted by Mr. Fudge are not of the nature to amount to a violation of the duties to cooperate and not to hinder performance in the particular circumstances of this contract, and in any event have little bearing on Universal's specific failure to comply with the contract requirements. Mister Fudge complained that the Navy was slow to respond to his questions, but his only specific example while Universal was in the design phase was the matter of the maximum height of the containments, which was clearly identified in the contract. *See* Tr. at 369–71; JX 2 at 23. Universal has not proven that the CO, the POC, or any other Navy representatives responded to his requests in an evasive or untimely manner. *Cf. Malone*, 849 F.2d at

1445–46 (finding a breach due to the CO's evasive and misleading conduct).

The Navy's refusal of Mr. Fudge's request to view the design of his competitor's product, *see* Tr. at 363, was not unreasonable nor did it prevent Universal from timely submitting the successful offer. *See* JX 2 at 1–3. That the shipyard laborers expressed surprise that Universal's structure was different from the Big Top one that they assembled earlier, Tr. at 375, does not prove a lack of sufficient cooperation. Their slow pace in assembling the Universal structure appears to have been primarily due to the disorganized manner in which the parts were delivered, and the lack of detailed assembly instructions which explained the color-coding system—instructions which the Navy requested March 30, 2000, DX 27 at 1–3, but did not receive until Universal responded to the cure notice on April 28, 2000. *See* JX 9 at 3–9. The Navy's decision not to allow Universal's technical representative to be any closer than 50 to 75 yards from the wind-damaged 50–foot section while it remained on the deck of the CGN 39, *see* Tr. at 188–89, 380, was a reasonable safety measure, *see* DX 39; Tr. at 135–36, that in any event did not hinder Universal's ability to design a structure complying with the contract specifications.

Despite Mr. Fudge's suspicions, *see* Tr. at 362–63, 377, 408, the evidence does not demonstrate that the Navy failed to cooperate with Universal due to any favoring of its rival Big Top. The CO for Universal's contract was not even involved in the Navy's prior purchase of containments from Big Top. Tr. at 96. The Court notes that communication between the parties appears to have been far from ideal, a point the government's expert even conceded. *See* Tr. at 334–35; DX 102 at 21. And since the issue was not explored at trial, the Court can only wonder what "clarifications" of the engineering calculations were sought by Mr. Peterson in late March 2000, *see* DX 28; whether these clarifications were ever obtained; and,

---

**17.** As noted in Section I.C, *supra*, summary judgment was granted to the government on Universal's fourth count, and the fifth count was dismissed by the Court as a claim for relief, and instead treated as a reply to the government's counterclaim. Order (May 8, 2003).

if they were not obtained, whether the process of clarifying the information would have resulted in Universal's submission of calculations documenting that the containments met the specifications, or would have resulted in the Navy learning—prior to installing the 50–foot section—that individual sections were not designed to withstand heavy winds. *But see* JX 7 (Universal providing the contact information for Mr. Morrison eight days after it was requested, and one day after the 50–foot section was installed). But such communications breakdowns do not make violations of the duty of good faith and fair dealing. Universal's design difficulties stemmed not from a lack of information from the Navy, but from the failure to carefully review the specifications before bidding. *See* Tr. at 364–65, 368, 417–18. The Navy's cooperation, including modifying the contract to extend delivery dates and allow Universal to substitute a different type of tubing, JX 5 at 2, and its willingness to accept delivery later than the deadline under the modification, *see* DX 27 at 1, was adequate under the circumstances.

### III. CONCLUSION

The Court had previously granted defendant summary judgment on Count IV of the amended complaint, and dismissed Count V of the amended complaint. Order (May 8, 2003). The Court had also dismissed without prejudice the portions of the amended complaint which sought money damages pursuant to a termination for convenience, under RCFC 12(b)(1) for lack of subject matter jurisdiction. Order (May 20, 2004).

Upon motion of the plaintiff, the Court hereby **DISMISSES** without prejudice the government's counterclaim for reprocurement and incidental costs, under RCFC 12(b)(1) for lack of subject matter jurisdiction.

After trial, for the reasons stated above, the Court finds that the government has proven that termination for cause was justified (Count I of the amended complaint); that Universal Shelters has failed to prove that its product substantially complied with the contract specifications (Count II of the amended complaint); and that Universal Shelters has failed to prove that the government violated the implied duty of good faith and fair dealing (Count III of the amended complaint). The defendant is entitled to judgment on all three of these counts. The Clerk of the Court is directed to enter **JUDGMENT** for the defendant on Counts I through IV of the amended complaint, and to **DISMISS** the amended complaint with prejudice. Each party is to bear its own costs.

**IT IS SO ORDERED.**